STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

**15-22**


JAMES NICHOLAS ARTERBURN

VERSUS

KAREN ANN POWERS ARTERBURN


\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. C-2007-6667
HONORABLE DAVID BLANCHET, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

**ULYSSES GENE THIBODEAUX
CHIEF JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of Ulysses Gene Thibodeaux, Chief Judge, John D. Saunders, and
Marc T. Amy, Judges.


**JUDGMENT AMENDED AND AFFIRMED AS AMENDED.**


**Philip Collins Kobetz
P. O. Box 80275
Lafayette, LA 70598-0275
Telephone:  (337) 291-1990
COUNSEL FOR:**
    **Plaintiff/Appellee - James Nicholas Arterburn**

**Theodore Glenn Edwards, IV
P. O. Drawer 2908
Lafayette, LA 70502
Telephone:  (337) 237-1660
COUNSEL FOR:**
    **Defendant/Appellee - Andre Doguet, Gordon & Assoc., ACCPA**

**Karen Ann Arterburn**
**In Proper Person**
**11015 Wilshire Chase Drive**
**Johns Creek, GA 30097**
**Telephone:  (337) 349-8433**
      **Defendant/Appellant - Karen Ann Powers Arterburn**

**THIBODEAUX, Chief Judge.**

Karen Ann Powers Arterburn appeals from a judgment partitioning the community property between herself and her former husband, James Nicholas Arterburn. For the following reasons, we amend the judgment to decrease the amount owed by Karen Ann Powers Arterburn to James Nicholas Arterburn from $458,029.79 to $204,874.85, and we affirm in all other respects.

## I.

## ISSUES

We must decide:

(1) whether the trial court's partition of community property was fundamentally erroneous;

(2) whether the trial court manifestly erred in not considering the appellant's alleged disability in partitioning the community property;

(3) whether the trial court manifestly erred in denying the appellant an opportunity to call witnesses; and

(4) whether the trial court erred in denying the appellant's motion to compel discovery.

## II.

## FACTS AND PROCEDURAL HISTORY

This matter involves protracted litigation over the partition of community assets and liabilities between Karen Ann Powers Arterburn (Karen) and James Nicholas Arterburn (Jim). The family's sole income derived from Jim's medical practices. Expenditures had been lavish and exceeded the husband's income. Finances immediately became a battleground. Temporary custody and use of the family home was first granted to Karen, and Jim was ordered to pay

$15,000.00 per month in spousal and child support. He was also ordered to pay all loans on the heavily mortgaged property, all debts, lines of bank credit, credit card payments, and all community expenses. Jim also paid cash advances to Karen on her share of the community.

After their daughter reached majority, Jim was granted custody of their son and also use of the family home. Jim remarried in May 2010. Karen was ordered to vacate the family home in May 2011. She relocated to Georgia, unilaterally moving seven tons of home furnishings from the family home to another state with her, in violation of the court's order. She was found in contempt and ordered to pay for an inventory of the movables and to pay for double-locked storage facilities.

The trial to partition the property was conducted in two parts, five days in April 2013, and four days in March/April 2014. In August 2014, the trial court issued a four-page judgment allocating assets and liabilities to each party and rendering a money judgment in favor of Jim and against Karen for $458,029.78. The trial court issued a thirty-one page opinion explaining its reasons for judgment, charting the community's assets and liabilities, along with each party's reimbursement claims, and setting forth with detail the trial court's calculation of the offsets and the equalizing sum owed by Karen.

On appeal, Karen assigns no errors, but objects narratively, and without specification, to the trial court's overall division of assets. In her brief, Karen cites no law, pleading that she is a pro se litigant without access to legal resources. She lists, however, eight law firms who have previously represented her in this matter. In her brief, she points to no evidence in the record, which consists of nine volumes of pleadings, twelve volumes of exhibits, and eight volumes of a

2

sealed record and exhibits from a prior appeal in this court. In spite of approximately 7,000 pages of documents in this appeal record, Karen asserts that she has no evidence to support her factual allegations. She does assert four issues for review, the first of which is a broad and general assertion that the trial court engaged in a fundamentally erroneous deliberative process. Karen further asserts that the trial court failed to acknowledge her disability, refused to allow her to call witnesses, and denied her motion to compel discovery. Because Karen is currently a pro se litigant who lacks formal training in the law and its rules of procedure, we will treat her issues as assignments of error and review them as such. *See Bernard v. Lafayette City-Parish Consol. Gov't.*, 11-816 (La.App. 3 Cir. 12/7/11), 80 So.3d 665, *writ denied*, 13-971 (La. 6/14/13), 118 So.2d 1088.

For the reasons that follow, we affirm the judgment in favor of Jim and against Karen but reduce the amount of the money judgment based upon a typographical error in one reimbursement claim, and based upon record evidence in three other reimbursement claims.

III.

**STANDARD OF REVIEW**

An appellate court may not set aside a trial court's findings of fact in the absence of manifest error or unless it is clearly wrong. *Stobart v. State, Through DOTD*, 617 So.2d 880 (La.1993); *Rosell v. ESCO*, 549 So.2d 840 (La.1989). A two-tiered test must be applied in order to reverse the findings of the trial court: (a) the appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court; and (b) the appellate court must further determine that the record establishes that the finding of the trial

court is clearly wrong (manifestly erroneous). *Mart v. Hill*, 505 So.2d 1120 (La.1987).

The trial court is vested with great discretion in effecting a fair partition of community property. *Collier v. Collier*, 00-1263 (La. App. 3 Cir. 7/18/01), 790 So. 2d 759, *writ denied*, 01-2365 (La. 12/7/01), 803 So.2d 30. Even where the appellate court believes its inferences are more reasonable than the fact finders, reasonable determinations and inferences of fact should not be disturbed on appeal. *Arceneaux v. Domingue*, 365 So.2d 1330 (La.1978). Additionally, a reviewing court must keep in mind that if a trial court's findings are reasonable based upon the entire record and evidence, an appellate court may not reverse said findings even if it is convinced that had it been sitting as trier of fact it would have weighed that evidence differently. *Housely v. Cerise*, 579 So.2d 973 (La.1991). The basis for this principle of review is grounded not only upon the better capacity of the trial court to evaluate live witnesses, but also upon the proper allocation of trial and appellate functions between the respective courts. *Canter v. Koehring Co.*, 283 So.2d 716 (La.1973).

IV.

## LAW AND DISCUSSION

*Fundamentally Erroneous Deliberative Process*

The lack of specificity in this assertion would require this reviewing court to manufacture errors, which we will not do. But, we will address some of Karen's more discernible complaints scattered throughout her appellate brief. Her complaints regarding the trial court's finding that she was not free from fault in the divorce and, therefore, not entitled to permanent spousal support are res judicata.

This court previously found in Appeal No. 12-34 that Karen did not file a timely appeal of the judgment denying permanent spousal support, and the Louisiana Supreme Court denied her application for supervisory writs on June 15, 2012. *See Arterburn v. Arterburn*, 12-34 (La.App. 3 Cir. 2/22/12), 82 So.3d 570 (unpublished opinion) (motion to dismiss granted), *writs denied*, 12-943, 12-1004 (La. 6/15/12), 90 So.3d 1066, and 90 So.3d 1068.

Karen further complains that the trial court failed to inform her of her constitutional rights, including her right to counsel. There is no such right to free, court-appointed counsel in civil community property partition cases. Indigent parents in child abuse and neglect cases are afforded legal representation pursuant to La.Ch.Code art. 571, and La.R.S. 15:185.1. The criminally accused indigent is allowed court appointed counsel if his offense is punishable by imprisonment, pursuant to La.Const. art. I, § 13. See also *State v. King*, 97-1249 (La.App. 3 Cir. 3/6/98), 707 So.2d 1374, distinguishing civil versus criminal proceedings and the right, or lack thereof, to free counsel. Karen's contention that she is entitled to free, court-appointed counsel in this partition case is unsupported and without merit in this appeal.

Karen seems to dispute the valuations of the assets, but the record does not support her broad accusations. For example, the appraiser valued the house at $990,000.00,[1] and fully explained the comparables he used from the same subdivision. Karen cross-examined him exhaustively, arguing that the house was worth $1.2 million, and that she saw no individual adjustments for the outdoor kitchen and fireplace, and the extra expenses put into the pool. The appraiser explained that he adjusted upward for the outdoor amenities, that they all came

---

[1]The dwelling itself was insured for $659,000.00.

under the pool and patio category, and that he gave the maximum addition allowed for the category. He explained that individual embellishments had an enjoyment value that did not translate into dollars in an appraisal context. It is well-settled that a trial court may not substitute its opinion for that of testifying experts or completely disregard such testimony, when the testimony is well grounded and based upon good reasoning. *See State, DOTD v. Yan Willet*, 386 So.2d 1023 (La.App. 3 Cir.), *writ denied*, 392 So.2d 692 (La.1980); *State, DOTD v. Tynes*, 433 So.2d 809 (La.App. 1 Cir.), *writ denied*, 437 So.2d 1153 (La.1983); and *Domino v. Domino*, 233 La. 1014, 99 So.2d 328 (La.1957).

Karen further asserts that there was an inequitable distribution of assets but fails to assert error in the trial court's math, its method of calculation, its listing or valuing of any particular asset, the balance owed on any liability, or the court's allowance on any reimbursement, all of which are painstakingly explained and charted in the trial court's thirty-one-page reasons for ruling. It is the appellant's burden to designate support in the record for the assertions and assignments of error raised in the appellant's brief. Pursuant to Uniform Rules— Courts of Appeal, Rule 2-12, the appellant's argument "shall include a suitable reference by volume and page to the place in the record which contains the basis for the alleged error." Not only does Karen fail to *support* her allegations by referring to the record, she fails to *allege* or *identify* the errors with enough specificity for this court to address. Notwithstanding, we have reviewed the trial court's overall method of calculation and have found no error in the methodology. The trial court valued the total assets of the community at $1,488,005.88, allocating $1,477,430.88 to Jim and $10,575.00 to Karen. The trial court determined the liabilities at $1,045,341.02, allocating *all* of the liabilities to Jim

and *none* to Karen.[2]  This was not error under the governing statute, La.R.S. 9:2801, because Karen had no income with which to pay the community's liabilities.  Under La.R.S. 9:2801(A)(4)(c):  "The court shall consider the nature

---

[2] The trial court's charts contained the following basic information; we have added comments parenthetically in italics to clarify findings in the record:

| Description of Community Assets | Loc./ With | Court's Value | Allocated to Karen | Allocated to James |
|---|---|---|---|---|
| Family home in Lafayette *(Bahlawar appraisal not refuted by other expert testimony)* | JNA | $ 990,000.00 | | $ 990,000.00 |
| Contents of the family home, including art, antiques, and Steinway grand piano | KAA JNA | 182,492.74 32,195.30 | | 182,492.74 32,195.30 |
| 2003 Acura MVX | KAA | 10,575.00 | 10,575.00 | |
| James N. Arterburn, M.D., APMC, (flow through entity)*(no assets; no receivables)* | JNA | -0- | | -0- |
| 50% Ownership Gastroenterology Clinic of Acadiana, Inc. *(CPA Thibodeaux used book value approach; operating agreement required valuation at ½ book value in event of member's death or divorce)* | JNA | 70,393.00 | | 70,393.00 |
| 16.66% Ownership Lafayette General Endoscopy Center *(value per CPA Martin hired by firm per operating agreement)* | JNA | 125,438.00 | | 125,438.00 |
| 401(K) *(per Smith Barney statements)* | JNA | 76,911.84 | | 76,911.84 |
| Infusion Center *(not a community asset; was phased out with sale of endoscopy center)* | | -0- | | -0- |
| Total Community Assets *($1,488,005.88)* | | | 10,575.00 | 1,477,430.88 |

| Description of Community Liabilities | Court's Value | Allocated To Karen | Allocated To James |
|---|---|---|---|
| Whitney Bank-Family Home 1st Mtg. | $ 621,997.39 | | $ 621,997.39 |
| Whitney Bank-Home Equity Mtg. (No. 3337) | 146,613.46 | | 146,613.46 |
| Whitney Bank-Personal Credit Line (No. 5046) | 46,730.17 | | 46,730.17 |
| Debt Owed-P.P. Arterburn Trust *(loan/debt signed by both spouses in 1997)* | 230,000.00 | | 230,000.00 |
| Total Community Liabilities | | | 1,045,341.02 |

7

and source of the asset or liability, the economic condition of each spouse, and any other circumstances that the court deems relevant." While under La.R.S. 9:2801(A)(4)(b) and (d), the court is required to provide each spouse with an equal *net* distribution, under La.R.S. 9:2801(A)(4)(c), the court "may divide a particular asset or liability equally or unequally or may allocate it in its entirety to one of the spouses."

Here, the trial court found that Jim's net assets were $432,089.86 (1,477,430.88 - 1,045,341.02), while Karen's net assets were $10,575.00 (10,575.00 - 0). The trial court found that the difference between Jim's net and Karen's net was $421,514.86, and that Jim owed Karen one half (½) of the difference, or $210,757.43, which is the correct result. *See David v. David*, 12-1051 (La.App. 3 Cir. 4/10/13), 117 So.3d 148, *writ denied*, 13-1541 (La. 10/7/13), 122 So.3d 1023. Stated another way, the overall net assets of the community were $442,664.86 ($1,488,005.88 - $1,045,341.02). Jim and Karen were each entitled to one half of the overall net assets, or, $221,332.43 each. Jim received $210,757.43 too much, and Karen received $210,757.43 too little. Thus, Jim owed Karen $210,757.43 as an equalizing payment on the community assets and liabilities. *See Mexic v. Mexic*, 577 So.2d 1046 (La.App 4 Cir. 1991). Accordingly, the trial court's method of calculation for the equalizing payment is not erroneous.

However, the calculation does not end there because each party is entitled to allowable reimbursements for separate funds that he or she used to pay community debts, or separate debts of the other spouse, after the community regime ended. The trial court found that Karen had support for $12,100.72 in

8

reimbursements,[3] and that Jim had support for $680,887.94 in reimbursements. Each party's claims offset the claims of the other spouse, resulting in a total reimbursement to Jim of the difference, or $668,787.22. Thus, the trial court found that Karen owed Jim $668,787.22 in reimbursements between the filing of suit in 2007 and the time of trial. When the amount Jim owed Karen, $210,757.43, was subtracted from the amount Karen owed Jim, $668,787.22, the trial court found that Karen owes Jim $458,029.79. *See David*, 117 So.3d 148. We find no error in the trial court's *method* of calculation. We now turn to the general law on reimbursements.

Due to the lack of specificity in Karen's brief, we are not directed to a particular reimbursement to which Karen objects. In general: "Except as provided in Article 2363, all obligations incurred by a spouse during the existence of a community property regime are presumed to be community obligations." La.Civ.Code art. 2361. "A separate obligation of a spouse is one incurred by that spouse prior to the establishment of a community property regime, or one incurred during the existence of a community property regime though not for the common interest of the spouses or for the interest of the other spouse." La.Civ.Code art.

---

[3]The trial court's charts contained the following figures; we have added clarifications in italics.

| *Reimbursements owed to Karen* | Court's Determination |
|---|---|
| Funds received from sale of Lafayette General Imaging *(½ of $11,100.00) (this is the only reimbursement claimed by Karen on her detailed descriptive list)* | $ 5,550.00 |
| Expert Witness Fees paid to Gordon and Associates, ACCPA *(½ of $2,727.75)* | 1,363.87 |
| Progressive Security Insurance Payment to James *(½ of $978.36)* | 489.18 |
| Value of 2003 BMW 330CI traded in by James Arterburn *( ½ of $9,395.33)* | 4,697.67 |
| Total Reimbursements to Karen Arterburn | $ 12,100.72 |

9

2363. "When a spouse uses separate funds to pay a community obligation, that spouse is entitled after termination of the community to reimbursement for one half of the amount paid. La.Civ.Code art. 2365. "An obligation incurred before the date of a judgment of divorce for attorney fees and costs in an action for divorce and in incidental actions is deemed to be a community obligation." La.Civ.Code art. 2362.1. "Reimbursement shall be made from the patrimony of the spouse who owes reimbursement." La.Civ.Code art. 2358.1.

While the reimbursement liability for payments made on community obligations is generally limited to a spouse's share of the net community assets, if the obligation was "incurred for the ordinary and customary expenses of the marriage, or for the support, maintenance, or education of children of either spouse in keeping with the economic condition of the spouses, the spouse is entitled to reimbursement from the other spouse regardless of the value of that spouse's share of all community property." La.Civ.Code art. 2365. The burden of proof is on the party claiming reimbursement. *Charles v. Charles*, 05-129 (La.App. 1 Cir. 2/10/06), 923 So.2d 786. A trial court's findings as to whether reimbursement claims have been sufficiently established are reviewable under the manifest error standard of review. *Kline v. Kline*, 98-1206 (La.App. 3 Cir. 2/10/99), 741 So.2d 670. Pursuant to La.Civ.Code art. 2367:

> If separate property of a spouse has been used during the existence of the community property regime for the acquisition, use, improvement, or benefit of community property, that spouse is entitled to reimbursement for one-half of the amount or value that the property had at the time it was used. The liability of the spouse who owes reimbursement is limited to the value of his share of all community property after deduction of all community obligations.

10

Buildings, other constructions permanently attached to the ground, and plantings made on community property with separate property of a spouse during the existence of the community property regime are community property. The spouse whose separate property was used is entitled to reimbursement for one-half of the amount or value that the separate property had at the time it was used. The liability of the spouse who owes reimbursement is limited to the value of his share in all community property after deduction of all community obligations.

The liability limitation to the value of the spouse's share of the community, which in this case was $221,332.43 each, only applies to expenditures made during the marriage. Louisiana Civil Code Article 2367's Revision Comments explain:

(a) This Article regulates reimbursement rights between the parties for the use of separate property or the making of buildings, other constructions permanently attached to the ground, and plantings only when the use or making is done during the existence of the legal regime. The rights of the former spouses for expenses and works made after termination of the community of acquets and gains are governed by the rules of co-ownership in Articles 804 and 806.

Accordingly, pursuant to La.Civ.Code art. 806:

A co-owner who on account of the thing held in indivision has incurred necessary expenses, expenses for ordinary maintenance and repairs, or necessary management expenses paid to a third person, is entitled to reimbursement from the other co-owners in proportion to their shares.

If the co-owner who incurred the expenses had the enjoyment of the thing held in indivision, his reimbursement shall be reduced in proportion to the value of the enjoyment.

Thus, payment of community obligations, necessary expenses, and ordinary maintenance and repairs on the family home that were made by Jim *after* the regime terminated and while Karen occupied the home, are reimbursable to

him at 50% by Karen, the other 50% co-owner of the property, with no limitation to her $221,332.43 share of the net assets. Our jurisprudence has found the following expenses reimbursable: One-half termite inspection cost, and one-half mortgage payments, tax payments, and insurance premiums on community residence made following termination of community, as they were necessary to maintain community property and to preserve its value. *Goines v. Goines*, 09-994 (La.App. 5 Cir. 3/9/11), 62 So.3d 193, *writ denied*, 11-0721 (La. 5/20/11), 63 So.3d 984; *See also Kline*, 741 So.2d 670; *and see Norman v. Norman*, 99-2750 (La.App. 4 Cir. 7/12/00), 775 So.2d 18 (necessary expenses that enhance the value of the property are reimbursable, such as waterproofing, tree removal, pest control, floor and roof replacement, garage repair, filling in swimming pool, yard restoration, side walk replacement, homeowner's association dues, and installation of an alarm system). *See also* La.Civ.Code art. 804.

Karen had possession of the family home for forty-two months. In addition to child support and interim spousal support, the trial court ordered Jim to make all mortgage payments and to pay all house-related expenses that would later be determined either as support owed, or, as advances upon Karen's part of the community. The housing expenses included the first mortgage, the equity mortgage, city and parish property taxes, homeowner's insurance, and homeowner's association dues. The court specified that one-third of the payments would be allotted as spousal support, one-third would be allotted as additional child support for their teenage daughter, and one-third would be allotted as additional child support for their younger son. When it was determined that Karen was not entitled to permanent spousal support, the trial court found that one-half of one-third of the housing expenses were reimbursable to Jim from that date forward.

When the daughter reached maturity, the trial court found that one-half of two-thirds of the payments were reimbursable from that date forward. And when the younger son, at age fourteen, wanted to live with his father, and custody transferred to Jim, uncontested by Karen, all of Jim's payments for housing expenses were found reimbursable for the remainder of Karen's use of the house.

Jim was not reimbursed for these housing expenses after Karen moved to Georgia and he began using the house again. The trial court painstakingly applied the fractions to the applicable periods of time, based upon the well-documented evidence in the record,[4] which Karen has not disputed. All payments of liabilities, including mortgages, loans, lines of credit, credit cards, balances, expenses and repairs paid by Jim were supported with work-sheets, bank statements, cancelled checks, invoices, and trial testimony.

However, we do find a typographical error in the charted amount for reimbursement of 2007 income taxes paid. The record supports the trial court's reasons for judgment allowing Jim a reimbursement of $63,483.79. The trial court's chart, however, reflects a reimbursement of $64,483.79. Therefore, we will amend the reimbursement amount by subtracting $1,000.00 to correct this typographical error.

In addition to the typographical error, we have found three reimbursements that are not supported in the record. The trial court allowed Jim a $176,298.21 reimbursement for one half of a $345,976.45 cash inheritance that Jim asserts was brought into the marriage as his separate property and spent on community expenses. Jim documents this claim with his bank statement from an

_____

[4] The record contains twelve volumes of exhibits pertaining to the parties' detailed descriptive lists.

Omaha account showing a deposit of $356,000.00 in 1984. Handwriting on the statement indicates that Jim received this money before he met Karen. Louisiana Civil Code Article 2341 provides in pertinent part:

> The separate property of a spouse is his exclusively. It comprises: property acquired by a spouse prior to the establishment of a community property regime; property acquired by a spouse with separate things or with separate and community things when the value of the community things is inconsequential in comparison with the value of the separate things used; property acquired by a spouse by inheritance or donation to him individually[.]

Louisiana Civil Code Article 2340 provides: "Things in the possession of a spouse during the existence of a regime of community of acquets and gains are presumed to be community, but either spouse may prove that they are separate property." The record reveals that Jim and Karen were not married until May 17, 1986. On June 5, 1986, the balance on a statement he presented from a Chicago account purports to show that the remainder of the inherited funds was $48,000.00. This appears to be the documented amount that Jim brought into the marriage. We cannot find support for reimbursing funds that are used before the community property regime legally began. Thus, the one half reimbursement for this claim is reduced from $172,988.21 to $24,000.00.

We further note that the VISA credit card debt paid by Jim, while mostly Karen's separate debt reimbursable at 100% to Jim, also covered community law firm debts of $6,314.06, as pointed out at trial, for which Jim is only entitled to one-half reimbursement. Thus, we reduce that reimbursement from $27,312.54 to $24,145.81.

Additionally, we must delete the reimbursement of $100,000.00 for one-half of the $200,000.00 donated to Jim by his parents. Funds received during

14

the community property regime are presumed to be community under La.Civ.Code art. 2340, which creates a rebuttable presumption in favor of the community. While Jim proved that he received checks made out to him from his parents in that amount during the marriage, he did not prove that the checks, which he testified to as gifts, were intended for him and not the community.

> Louisiana jurisprudence has firmly established that the only issue with respect to gifts of this nature is whether the donor intended her donation as a gift to the individual or to the community. In answering that question, the intention of the donor controls the identity of the donee or donees. *Allbritton v. Allbritton*, 561 So.2d 125 (La.App. 3rd Cir.), *writs denied*, 565 So.2d 445, 454 (La.1990). As stated earlier, the burden of overcoming the presumption of community property set out in LSA-C.C. Art. 2340 rests upon the party who asserts that the property is separate. *Id.*

*Hebert v. Hebert*, 94-864, p. 4 (La.App. 3 Cir. 2/15/95), 650 So.2d 436, 439.

In *Hebert*, the court found that neither the proceeds of the mother's life insurance policy, nor the monthly checks she gave to her son to pay the premiums, had been proved to be the son's separate property because the mother did not testify as to her intent, and the son's testimony did not rebut the presumption of community. Similarly here, Jim testified that his parents gave him the checks and deposits at the end of every year to be put toward the interest due on the community debt to the P.P. Arterburn Trust, and to help pay the property taxes on the community home. Thus, by Jim's own testimony, the funds were intended for the benefit of the community, and Jim did not call his parents to testify otherwise. We, therefore, delete the reimbursement for $100,000.00.

Accordingly, we have amended four figures, reducing Jim's total reimbursements from $680,887.94 to $427,733.00.[5]

_____

[5]We have recreated the trial court's chart; added clarifications in italics; bolded and italicized entries that we find to require amendment; and we have entered the amended figures beneath the trial court's figures:

| *Reimbursements owed to Jim* | Court's Determination |
|---|---|
| Mardi Gras Expenses deferred to trial ($61,724.98)*(court found each had paid ½)* | $    -00.00- |
| Cost of Custody Evaluation paid with separate funds *(½ of $2,000.00 invoice)* | 1,000.00 |
| Payments to Whitney Bank on First Mortgage *(after fractions & division applied)* | 76,473.46 |
| Payments to Whitney Bank on Equity Mortgage *(after fractions & division applied)* | 8,481.89 |
| Payments to Whitney Bank on Personal Credit Line (# 5046) *(½ of $14,912.79)* | 7,456.39 |
| Payments of Homeowners Insurance *(after fractions & division applied)* | 13,353.06 |
| Payments of Property Taxes *(after prorated and fractions & division applied)* | 14,175.40 |
| Payments of Homeowners Association Dues *(after fractions & division applied)* | 2,097.50 |
| Home Repairs made with separate funds *(½ of $68,567.62)* | 34,283.81 |
| Cash Advances to Karen on her share of community, with separate funds | 55,000.00 |
| 2007 Income Taxes paid *($133,931.00 prorated; fractions applied = $63,483.79)* | *(64,483.79)*<br>63,483.79 |
| Karen's Attorney and Accounting Fees prior to Divorce on 2/5/09 *(½ of $12,586.94)* | 6,293.47 |
| Payment of Community Credit Card Debt (AMEX #41004) | 48,833.00 |
| ***Payment of Credit Card Debt (VISA #0749)*** *(100% of $20,988.78 for Karen's separate debt and ½ of $6,314.06 for community debt to law firms = $24,145.81)* | *(27,312.54)*<br>24,145.81 |
| ***Separate Property used for benefit of community*** *(½ of $200,000.00 in  donations from Jim's parents evidenced by checks to Jim or deposits in his account, to be used for payment of community debt to Trust and property tax on house =0 in this case)* | *(100,000.00)*<br><br>-0- |
| ***Separate Property used for benefit of community*** *(½ of $345,976.45 in cash brought into marriage by Jim, used for community and its expenses)(evidence supported only $48,000.00 brought into marriage, ½ of which is $24,000.00)* | *(172,988.21)*<br><br>24,000.00 |
| Payments of Community Liabilities (interest on community note to P.P. Arterburn Trust *(½ of $62,100.00)* | 31,025.00 |
| Payment of Karen's storage fees *(100% her separate obligation imposed by court for contemptuous removal of property to Georgia, in lieu of 120 days in jail)* | 5,326.67 |
| Jim's Attorney Fees incurred prior to Divorce on 2/5/09 *(½ of $24,607.50)* | 12,303.75 |
| Total Reimbursement Claims of James Arterburn | $*(680,887.94)*<br>$ 427,733.00 |

When Jim's reimbursements of $427,733.00 are offset by Karen's reimbursements of $12,100.72, Karen owes Jim net reimbursements of $415,632.28. When Jim's equalizing payment to Karen of $210,757.43 is subtracted from the $415,632.28 that she owes him, the net amount owed Jim, and the money judgment against Karen, is $204,874.85. Accordingly, we reduce the money judgment against Karen from $458,029.79 to $204,874.85.

### *Karen's Medical Disability*

Karen contends that the trial court erred in failing to acknowledge her medical disability, which exacerbated her health problems and inhibited her ability to put on her case. She does not provide this court with the nature of the disability alleged; nor does she point to any documentation in the 7,000 pages of the record to support the allegation. Since this is not a personal injury case, and the appellant's health is not at issue in this community property dispute, evidence of disability eight years after the divorce is irrelevant. Thus, the argument on this issue is without merit.

### *Denial of Right to Call Witnesses at Trial*

Karen contends that she verbally requested witnesses for trial, but her requests were denied. We found no support for this assertion. The trial court specifically told her in court that she could bring in witnesses. She did not subpoena any witnesses; no one volunteered; and she did not attempt to call any witness.

## Other Complaints

Likewise, our review of the record reveals that Karen's other complaints scattered throughout her brief have no merit. She asserts that she was bullied and threatened with incarceration. The record reveals that the opposite was true. On many occasions, Karen openly defied, rebuked, and personally insulted the trial judge, stating that she could not believe that he was the head of the family court. When he gave an order, she said, "No." She told him on the record, referring to him in the first person, that he did not know what he was doing. In reading the transcripts and reasons for ruling, we perceived an articulate, well-reasoned, well-intentioned, patient, and enthusiastic jurist who encouraged and counseled the Arterburns from the very beginning of this litigation, and who had the best interest of this family as the goal of his rulings.

His threat of incarceration was for contempt of court following this incredibly disrespectful behavior by Karen. When Karen refused to schedule any visitation whatsoever with her fourteen-year-old son, the trial court almost begged her to reconsider and to start immediately to repair that relationship before the alienation became irreparable. She refused, saying that she would fix it when he was an adult. We further find no support for her complaints regarding unsealing the record which she herself had sealed. Proper notice was sent to her regarding the hearing on her motion to lift the seal, and she did not appear.

## Denial of Discovery

Karen contends that the trial court should have compelled all discovery pursuant to her requests, even if the documents had already been produced to her former attorney, Brad Felder, before he withdrew from her case.

She expected new copies and indicated that it was "trickery" by the officers of the court to refuse to make another copy. At trial, it was determined that Karen never retrieved her files from an earlier attorney, Andre' Doguet, who had received responses to extensive discovery propounded on her behalf. Jim asserts that it was not his obligation to re-copy thousands of pages of documents, contained in twelve boxes, because Karen chose not to retrieve her files from her previous attorneys.

The record contains a letter from Brad Felder to Karen, dated in December of 2011, offering to send her files to another attorney or arrange for her to pick them up from his office. During trial in March of 2013, Karen asserted that she did not have Brad Felder's files because she had them delivered to another attorney whom she had retained to sue Mr. Felder for malpractice, but that attorney changed his mind about the representation. Karen admitted that she had never retrieved the twelve boxes of materials that she had had delivered to him. She introduced e-mail communications between herself and the attorney, Sera Russell, and his staff. Karen was notified in July 2012 that Mr. Russell would not represent her in a malpractice claim against Mr. Felder, but that he would help her get the twelve boxes of files to another attorney. When Karen called him over eight months later, she was advised that the file boxes had been put in storage and could be retrieved at a cost of $156.87, which she did not pay.

The court's minutes reflect that the court denied Karen's motion to compel discovery responses based upon her failure to demonstrate that the documents had not already been produced. The trial court suggested that Karen re-file her motion to compel and subpoena Brad Felder to testify as to whether there was any outstanding discovery that had not been provided. Karen did not do so.

Jim asserts that the trial court's refusal to compel the production of discovery that had already been produced was not error. We agree.

> A trial court has broad discretion in handling discovery matters and an appellate court should not upset a ruling absent an abuse of discretion. *Sercovich v. Sercovich*, p. 5 (La.App. 4 Cir. 6/13/12), 96 So.3d 600, 603. Under this abuse of discretion standard of review, "[a]n appellate court must balance the information sought in light of the factual issues involved and the hardships that would be caused by the court's order when determining whether the trial court erred in ruling on a discovery order." *Id.*, citing *Wollerson v. Wollerson*, 29,183, p. 2 (La.App. 2 Cir. 1/22/97), 687 So.2d 663, 665.

*Favrot v. Favrot*, 12-1573, p. 4 (La.App. 4 Cir. 5/1/13), 115 So.3d 1190, 1193, *writ denied*, 13-1735 (La. 11/1/13), 125 So.3d 433. In *Favrot*, the court stated:

> The discoverability test under La. C.C.P. art. 1422 entails first asking whether answering the discovery is feasible and practicable. If that answer is in the affirmative, then the court determines whether an answer to the discovery would "expedite the litigation by either narrowing the area of controversy or avoiding unnecessary testimony or providing a lead to evidence." *Industrial Pipe, Inc. v. Plaquemines Parish Council*, 12-1348, pp. 7-8 (La.App. 4 Cir. 9/14/12), 100 So.3d 896, 900.

*Id.* at 1194.

The fourth circuit in *Favrot* found no abuse of discretion in the trial court's refusal to compel discovery when the documents sought had previously been made available to the appellant for his review and copying, and he chose not to avail himself of the opportunity to review the requested documents for the more than eight-month period that the boxes of documents were made available to him. The court further found that the appellant had ample experience to go through the boxes to locate the information he needed. Similarly here, Karen had ample opportunity to obtain the documents; she has a degree in business/finance; she

represented herself at trial; she was, therefore, capable of understanding what documents she needed to prepare her defense and how to locate them. Accordingly, we find no abuse of discretion in the trial court's denial of the motion to compel discovery.

V.

## CONCLUSION

Based upon the foregoing, the money judgment against Karen and in favor of Jim is amended from $458,029.79 to $204,874.85; and the trial court's judgment is affirmed in all other respects. Each party is to bear its own costs for this appeal.

**JUDGMENT AMENDED AND AFFIRMED AS AMENDED**.