NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

21-411


AZALEE SUZANNE THOMAS BRANCH

VERSUS

WILLIAM HOWARD BRANCH


**********


APPEAL FROM THE
NINTH JUDICIAL DISTRICT COURT
PARISH OF RAPIDES, NO. 259,923
HONORABLE GEORGE C. METOYER, JR., DISTRICT JUDGE

**********

CANDYCE G. PERRET
JUDGE

**********

Court composed of D. Kent Savoie, Candyce G. Perret, and Charles G. Fitzgerald, Judges.


AFFIRMED.

**J. Ogden Middleton, II, P.L.C.**
**1744 White Street**
**Alexandria, LA   71301**
**(318) 443-4377**
**COUNSEL FOR DEFENDANT/APPELLANT:**
     **William Howard Branch**

**Koby D. Boyett**
**2230 South MacArthur Drive, 2nd Floor**
**Alexandria, LA   71301**
**(318) 442-9462**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
     **Azalee Suzanne Thomas Branch**

**PERRET, Judge.**

William Howard Branch ("Bill") appeals a December 22, 2020 judgment that partitioned the community property between himself and his former wife, Azalee Suzanne Thomas Branch ("Suzanne"), and dismissed his petition against her for mismanagement, bad faith, and/or fraud. For the following reasons, we affirm.

**FACTS AND PROCEDURAL HISTORY:**

Suzanne and Bill were married on March 5, 2011, and established their matrimonial domicile in the Parish of Rapides, Louisiana. On May 29, 2014, Bill had a stroke that caused him to be hospitalized for four months in Houston, Texas. On September 22, 2017, Suzanne filed a Petition for Divorce, and a judgment of divorce was rendered on April 16, 2018. In December 2017, both Suzanne and Bill filed petitions to partition the community property.

On March 17, 2020, Bill filed a Petition for Mismanagement, Bad Faith and/or Fraud, Fair Market Rental Value and for Attorney's Fees and Costs alleging that Suzanne had "violated Louisiana Civil Code Article 2354[1] and that she mismanaged their former community property, that she engaged in bad faith and fraud in her conduct in that regard, and that she is to be held accountable for her having damaged him in the process." Because the petition provides additional facts and forms the basis of this appeal, it specifically provides:

3.

> In the course of this partition proceeding, [Suzanne] admitted three Capital One Bank accounts, namely:
>
> a.    Capital One Acct. # ...XXX1627 [a joint account];
>
> b.    Capital One Acct. # ...XXX9326; [a joint account]; and

---

[1] Louisiana Civil Code Article 2354 states that "[a] spouse is liable for any loss or damage caused by fraud or bad faith in the management of the community property."

c. Capital One Acct. #...XXX0007 [a separate account in only her name].

4.

These three accounts were identified by [Suzanne] as the Capital One Bank checking accounts in her name solely and two that were held jointly with [Bill] during the time of their marriage.

5.

There was no disclosure by [Suzanne] of a fourth Capital One Bank Acct. # ...XXX0064 in either of her Sworn Detailed Descriptive Lists.

6.

[Bill] avers that this account is in the name of **SUZANNE T. BARBER** alone and that this account is a "POD" account "payable on death". . . .

7.

[Suzanne] identified herself on this account using the last name of one of her former husbands. It took an Order from this Court to force her production of documents related to Acct. # ...XXX0064.

### *[Bill] as Principal and [Suzanne] as his Mandatary*

8.

[Bill] avers that on May 29, 2014, [he] suffered a major stroke.

9.

[Bill] avers that on June 4, 2014, [Suzanne] had prepared, presented, executed and notarized in [Bill's] hospital room at Rapides Regional in Alexandria, Louisiana a "**General Act of Procuration and Power of Attorney**" which bears the notarized signatures of both the mandatary [Suzanne] and the principal [Bill].

. . . .

12.

As his mandatary, [Suzanne] is required to independently account to her principal [Bill] by Louisiana Civil Code article 3003 from that date of the mandate's creation on June 4, 2014 forward until it was revoked by [Bill] on January 31, 2018 [Conveyance Book 2079-992] as to what she did in managing his affairs as the principal and their former community property.

2

. . . .

### *Capital One Joint Acct. # ...XXX9326*

17.

With the services of a board certified Fraud Examiner who is also certified in Financial Forensic Chad M. Garland, C.P.A., [Bill] is able to with information and belief aver that [Suzanne] transferred ONE HUNDRED THIRTY TWO THOUSAND AND TWO HUNDRED ($132,200.00) DOLLARS from their joint account at Capital One Acct. # ...XXX9326 to her account in the name of **SUZANNE T. BARBER** in Acct. # ...XXX0064.

18.

[Bill] avers that at no time during his marriage to [Suzanne] did he even know of her account in the name of **SUZANNE T. BARBER** in Acct. # ...XXX0064, averring that "Barber" is her last name from her prior marriage and that she kept this account secret from him.

19.

[Bill] avers that the forensic accountant Chad Garland also identified several other material facts after analysis of this joint account:

a.   Untraceable ACH withdrawals equaling $33,735;

b.   Untraceable Checks written for cash signed by Suzanne equaling $17,300;

c.   Untraceable ATM withdrawals equaling $17,760; and

d.   Traceable transfers to Suzanne's private Capitol One Account "5610" equaling $7,793.

20.

The calculations by the forensic accountant shows that the total of the major withdrawals from this joint account equaled TWO HUNDRED AND EIGHT THOUSAND SEVEN HUNDRED AND EIGHTY EIGHT ($208,788) DOLLARS.

### *Capital One Joint Acct. # ...XXX1627*

21.

[Bill] also retained the forensic accountant Mr. Garland to evaluate and analyze the second joint account at Capital One to ascertain whether similar transfers were made from the second joint

3

account to the secret account maintained by [Suzanne] in her former marital last name Barber.

22.

[Bill] avers that the forensic analysis of the second joint account determined with precision that his ex wife, [Suzanne] had traceable transfers to Suzanne's private Capital One account "0064" equaling an additional ONE HUNDRED THIRTY ONE THOUSAND SIX HUNDRED AND EIGHTY FIVE ($131,685) DOLLARS.

23.

Accordingly, [Bill] avers the forensic accountant's work shows a total of TWO HUNDRED SIXTY THREE THOUSAND EIGHT HUNDRED AND EIGHTY SEVEN ($263,887) DOLLARS of community funds was systematically transferred from the two joint accounts into [Suzanne's] secret account that she had established in her former husband's last name that [Bill] knew nothing about.

24.

Additionally, the forensic accountant's analysis showed several other material features displayed clearly in the second joint account:

    a.    Untraceable Customer withdrawals signed by Suzanne = $302,921;

    b.    Untraceable Checks written for cash signed by Suzanne = $57,138;

    c.    A Check signed by William to Suzanne = $50,000; and

    d.    Traceable Transfers to Suzanne's private Capital One account "0007" = $10,100.

25.

[Bill] avers that the total of the major withdrawals from this second joint account equaled FIVE HUNDRED FIFTY ONE THOUSAND AND EIGHT HUNDRED FORTY FOUR ($551,844) DOLLARS.

26.

[Bill] avers that a fiduciary relationship exists between him and his ex-spouse defendant until their community regime has been divided and an accounting between these former spouses has been completed as recognized by *In re Green*, Bkrtcy.W.D.La.2005, 352 B.R. 771.

27.

[Bill] avers that [Suzanne] has not made a full disclosure of the community property and its value, an obligation recognized by *Theriot v. Theriot*, (La. App. 1 Cir. 1993) 622 So.2d 257, *writ denied*, 629 So.2d 1138.

28.

[Bill] avers that [Suzanne's] numerous transfers from their two community property accounts many of which are entirely untraceable amounted to misrepresentations about community property at the time of the dissolutions of their marital regime amounted to a deliberate pattern constituting fraud.

29.

[Bill] avers that [Suzanne] egregiously mismanaged the moneys from the two community property bank accounts by placing hundreds of thousands of dollars of community funds into her secret bank Acct. # ...XXX0064 without the knowledge of [Bill] in violation of her fiduciary duties as both his spouse and as the holder of his mandate.

30.

[Bill] avers that [Suzanne] engaged in these transfers with the specific intent to defraud him of his community interest in the money she transferred from the community accounts to her Acct.# ...XXX0064 and that she untraceably withdrew as cash from the teller windows and that she untraceably withdrew by writing checks to herself for cash.

. . . .

33.

[Bill] avers that [Suzanne] failed to show good faith, fairness and compliance with her fiduciary duties to him as her ex-spouse and principal as he was simply unaware of her numerous trasfers [sic] to her secret account or directly to her possession through the cash checks she wrote to herself and direct cash withdrawals.

34.

[Bill] avers that he should not only be reimbursed for her fraudulent dispositions of their community property, but that the Court should award him damages over and above simply a judgment transferring to him one half of the amounts the Court finds that she took possession of.

5

On May 28, 2020, Suzanne filed an answer to the petition for mismanagement and/or fraud wherein she denied any wrongdoing.

At the end of a three-day bench trial, the trial court partitioned the community property and concluded that the evidence failed to prove that there was any mismanagement, theft and/or misrepresentation of the community assets by Suzanne. Pertinent to this appeal, the trial court judgment specifically ruled:

> The reimbursement claim of [Bill] for the pre-divorce BALLARD, LLC buy-out installments is denied, finding no proof of reimbursable community use.

> The reimbursement claim of [Bill] for the BBPWP, LLC pre-divorce buy-out installments is denied, finding no proof of reimbursable community use.

> . . . .

> **IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that there is insufficient evidence to support the claims set forth in that certain "Petition for Mismanagement, Bad Faith and/or Fraud, Fair Market Rental Value and for Attorney's Fees and Costs" as filed by [Bill] on March 17, 2020; other than the claim for fair market rental value; such that this Court finds that there was no mismanagement, no theft, and no misrepresentation of community assets by [Suzanne] in her individual capacity nor in her capacity as mandatary for [Bill], and all such claims are hereby dismissed.

Bill now appeals this judgment, alleging the following three assignments of error:

> The trial court abused his discretion, manifestly erred and committed reversible factual and legal error in its December 22, 2020 "Judgment of Partition":

> 1. By denying [Bill's] **"PETITION FOR MISMANAGEMENT, BAD FAITH AND/OR FRAUD AND FOR ATTORNEY'S FEES AND COSTS"** and failing to find the appellee's behavior during the marriage involving her secret bank account was legal mismanagement reflecting both bad faith and fraud.

> 2. By denying [Bill's] **"PETITION FOR MISMANAGEMENT, BAD FAITH AND/OR FRAUD AND FOR ATTORNEY'S FEES AND COSTS"** in which he sought an accounting by [Suzanne].

6

3. By denying [Bill's] reimbursement claim for the proceeds from the sale of his separate property that was deposited into the community joint bank accounts.

**STANDARD OF REVIEW:**

On appeal, Bill argues that the trial court committed legal errors necessitating a de novo review by this court. However, we do not find that the trial court applied incorrect principles of law, and therefore, we review this matter under the manifest error standard of review.

Under a manifest error standard of review, this court can only reverse if it finds, based on the entire record, that there is no reasonable factual basis for the factual finding and that the fact finder is clearly wrong. *Stobart v. State, Through DOTD*, 617 So.2d 880 (La.1993). Thus, this court must not re-weigh the evidence or substitute its own factual findings just because it would have decided the case differently. The jurisprudence also holds that a "trial court is vested with great discretion in effecting a fair partition of community property." *Arterburn v. Arterburn*, 15-22, p. 4 (La.App. 3 Cir. 10/7/15), 176 So.3d 1163, 1167.

**DISCUSSION:**

Under Louisiana law, "[p]roperty of married persons is either community or separate." La.Civ.Code. art 2335. Property in the possession of a spouse during the existence of the community property regime is presumed to be community, but either spouse may rebut the presumption. La.Civ.Code art. 2340. Louisiana Civil Code Article 2338 defines community property as follows:

> The community property comprises: property acquired during the existence of the legal regime through the effort, skill, or industry of either spouse; property acquired with community things or with community and separate things, unless classified as separate property under Article 2341; property donated to the spouses jointly; natural and civil fruits of community property; damages awarded for loss or injury to a thing belonging to the community; and all other property not classified by law as separate property.

7

Louisiana Civil Code Article 2341 defines separate property as follows:

The separate property of a spouse is his exclusively. It comprises: property acquired by a spouse prior to the establishment of a community property regime; property acquired by a spouse with separate things or with separate and community things when the value of the community things is inconsequential in comparison with the value of the separate things used; property acquired by a spouse by inheritance or donation to him individually; damages awarded to a spouse in an action for breach of contract against the other spouse or for the loss sustained as a result of fraud or bad faith in the management of community property by the other spouse; damages or other indemnity awarded to a spouse in connection with the management of his separate property; and things acquired by a spouse as a result of a voluntary partition of the community during the existence of a community property regime.

Under La.Civ.Code art. 2360, "[a]n obligation incurred by a spouse during the existence of a community property regime for the common interest of the spouses or for the interest of the other spouse is a community obligation." Further, La.Civ.Code art. 2361 states that "[e]xcept as provided in Article 2363,[2] all obligations incurred by a spouse during the existence of a community property regime are presumed to be community obligations."

According to La.Civ.Code art. 159, "[a] judgment of divorce terminates a community property regime retroactively to the date of filing of the petition in the action in which the judgment of divorce is rendered." Upon termination of the community, "[e]ach spouse owns an undivided one-half interest in former community property and its fruits and products." La.Civ.Code art. 2369.2.

---

[2] Louisiana Civil Code Article 2363 states, as follows:

A separate obligation of a spouse is one incurred by that spouse prior to the establishment of a community property regime, or one incurred during the existence of a community property regime though not for the common interest of the spouses or for the interest of the other spouse.

An obligation resulting from an intentional wrong or an obligation incurred for the separate property of a spouse is likewise a separate obligation to the extent that it does not benefit both spouses, the family, or the other spouse.

8

### *The Petition for Mismanagement, Bad Faith and/or Fraud:*

Bill's first two assignments of error allege that the trial court erred in denying his petition for mismanagement, bad faith and/or fraud against Suzanne in her management of the community property. Bill alleges that he was forced to retain the services of a forensic accountant to determine how Suzanne handled the two community checking accounts and whether she transferred funds from the community accounts into her own secret banking account. Bill argues that it was only after he filed his petition for mismanagement that Suzanne admitted "to the existence of the POD account in her name with her former husband's last name [Suzanne T. Barber] much less its contents of $285,493.64."

In response, Suzanne alleges that the trial court was presented with sufficient evidence to rebut the allegations of fraudulent transfers and that Bill's own expert witness, Chad Garland, "could not definitely attest that the transfers were fraudulent or even undertaken in bad faith[.]"

Under an equal management system, both the husband and wife are managers of community property and either "spouse acting alone may manage, control, or dispose of community property unless otherwise provided by law." La.Civ.Code art. 2346. Although La.Civ.Code art. 2354 provides that "[a] spouse is liable for any loss or damage caused by fraud[3] or bad faith in the management of the community property[,]" this article does not impose a fiduciary duty upon the managing spouse. As stated in *McClanahan v. McClanahan*, 03-1178, pp. 4-5 (La.App. 5 Cir. 2/23/04), 868 So.2d 844, 848, *writ denied*, 04-1175 (La. 9/3/04), 882 So.2d 609 (internal citations omitted):

---

[3] While La.Civ.Code art. 2354 does not define fraud, La.Civ.Code art. 1953 states that "[f]raud is a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other. Fraud may also result from silence or inaction."

9

In interpreting La. C.C. art. 2354, the jurisprudence has recognized, since the 1980 community property revision, that no fiduciary duty exists with respect to management of community property. It seems that acting out of self interest is not enough to constitute fraud or bad faith under Article 2354. Rather, a subjective element, the intent to injure or the intent to reduce a spouse's community interest, must be established. In other words, more than financial injury must be shown.

The court in *Katz v. Katz*, 423 So.2d 1277 (La.App 4 Cir. 1982), *writ denied*, 427 So.2d 860 (La.1983), also required evidence of the intent to injure the non-managing spouse. Specifically, the court held that the wife did not have a cause of action against her husband for mishandling community assets because "[t]here [was] no evidence of any fraud in [the] record, and no evidence of a disposition of property intentionally designed to injure the wife by reducing her community interest. *Id.* at 1279.

In the case *sub judice*, Suzanne filed the petition for divorce on September 22, 2017; therefore, the couple's community property regime terminated on that date. At trial, Bill called Chad Garland, an expert forensic CPA, to testify regarding the marital community and the mismanagement claims against Suzanne. Mr. Garland testified that he examined both Bill and Suzanne's banking accounts over a five-year period and discovered that there were multiple transactions evidencing the fact that money was being deposited into the couple's joint checking account then being transferred into Suzanne's separate savings account and vice versa. Mr. Garland also testified that there were many untraceable ACH withdrawals and untraceable ATM withdrawals but that he "can't say who withdrew it or where it went." When specifically asked about funds being transferred into Suzanne's private Capital One xxx0064 account, Mr. Garland testified as follows: "As [Bill] testified, I think what made him first aware of the transfers back and forth was the incident with the Hundred Thousand Dollars. But then [Suzanne] put the money back after he brought

10

it to her attention." Although Mr. Garland continued to testify that there was a pattern of having Bill's separate property being deposited into the joint checking accounts then transferred into Suzanne's private account, the trial judge repeatedly noted that the evidence did not show whether it was Suzanne or Bill transferring the money into the separate or joint accounts. Mr. Garland also testified that he was unable to determine which party was doing the online banking from the documents submitted.

On cross examination, Mr. Garland testified that Suzanne's savings account 0064 had a balance of $130,000.00 on March 5, 2011, the day of her marriage to Bill, and that it had a balance of $285,493.00 in community funds on the day she filed her petition for divorce. When asked what the issue was with the 0064 savings account, Mr. Garland testified as follows:

> A    I think the issue, from [Bill]'s standpoint, was that he didn't know or understand why there was so much money moved out of the Joint Account into the 0064 Account. And from his and my conversations with him, he -- he says he did not know about 0064.
>
> Q    The money's still there. It has gained, based on your testimony, a little bit of interest, and is a Hundred and Thirty-four Thousand -- a Hundred Fifty-four Thousand Dollars that got saved.
>
> A    It is the increase in the account, but also there was a lot of money put into it too, though, over the -- over --
>
> Q    Isn't that the nature of a savings account?
>
> A    Possibly.

Mr. Garland was also questioned about his report and the conclusions he made upon examining the couple's bank accounts. Specifically, he testified as follows:

> Q    So when you created your Report, is it fair to say you didn't have all the facts?
> A    Not in this particular -- on this particular deposit, I did not.

11

Q    Okay.  And your lack of factual basis caused you to make about a Hundred and Twenty Thousand Dollar ($120,000.00) error.  Is that correct?

A    Yes, but I would disagree with -- because what I was hired to do was to follow the money that Bill thought that his ex-wife had taken from him and that he did not know about.

Q    Okay.

A    Whether that money was all attributable to her, is all attributable to him or half and half, it really wasn't what I was hired to do.

Q    Okay, but you made great hay out of Bill made all these deposits, and Suzanne made these little deposits.  That's not exactly true, is it?

A    She made a lot of deposits.  I mean . . .

Q    There we go.

A    . . . she made her own deposits. I'll – I'll give her that.  She was working and making a good income.

     . . . .

Q    (By Mr. Boyette) In your line of work, Mr. Garland, do you often analyze marital bank accounts?

A    (By the witness) Yes.

Q    Do husbands and wives typically have [access] to joint bank accounts?

A    Yes.

Q    Do husbands and wives typically spend money in the course of a marriage?

A    Yes.

Q    Based on your analysis of Joint Account 1627, in your expert opinion, can you say that Suzanne Branch exhibit[ed] a subjective intent to injure or reduce Bill's community interest in this Joint Account?

     . . . .

A    The only thing that I can say . . .
     . . . .

12

A . . . is, is I'm not the trier of fact. That all I can do is point out to the Judge that there wa[s] a large amount of money that was transferred out of the 1627 Account into there 0064 Account. That's all I can speculate. What happened with the money? What she did with it? Is that legal; is it not legal? I'll let the Judge make up that. I don't – I'm not gonna make a legal conclusion.

Q Is that money still in 0064?

A Not all of it, but there is a good piece of it.

Q Good piece of it. And the difference, you don't know where that went?

A I do not know where it went.

Q Let's jump down to the Summary of Deposits and Withdrawals. That would be Subsection 4 of Section 3, the last page.

A Okay.

Q It talks about withdrawals attributable to Suzanne. I don't see a section labeled, 'Summary of Deposits and Withdrawals Attributable to Bill.' Am I missing that, or that was outside your scope of hire?

A That was outside my scope of hire.

Q I'm gonna drop down to Section 4: Summary of Opinion. In your Summary, you state, and I -- and I hate to belay this point; I'm gonna read it: 'I find it unusual that Suzanne Branch withdrew such large amounts of community property funds on the joint accounts, depositing some of them into one or more of her own separate private accounts. She had three personal accounts and one additional account with three unknown individuals. There were substantial withdrawals for Cash, either by check or at the bank's window. I was not able to determine the in [sic] uses or final destination of the funds withdrawn from the joint accounts or the Cash Withdrawals by Suzanne Branch, and therefore, cannot express an opinion on the reasons the funds were withdrawn.'

Is it fair to say that you found some of these transfers unusual?

A That's correct. I do.

Q Okay. Is the moniker unusual, indicative of mismanagement?

A That is gonna be up for the trier of fact to decide.

13

Q Okay. And you were not able to determine the end use of these withdrawn funds; correct?

A No, sir, I was not.

Q Okay. Is it possible that the end use was for legitimate community interest?

. . . .

A It could or could not have been. I mean it's -- I don't know. That's what I said, I do not know.

Q Okay. In your expert opinion, Mr. Garland, has Suzanne evidenced a malevolent mental state related to decreasing the amount of money Bill is to receive?

A Again, I mean that's -- that's --

. . . .

A I'm not a psychiatrist, so I can't say that.

Bill also testified at trial and acknowledged that he had joint checking accounts with Suzanne throughout their marriage. Bill testified that he donated half of his home, located at 461 Williford Road, Ball, LA, to Suzanne after they made substantial renovations to the property in 2011. Bill testified that they paid for the improvements to the Williford Road home with cash taken out of their joint checking account.

Following his stroke in 2014, Bill testified that he and Suzanne downsized by selling the Williford Road home and purchasing, with cash from their joint checking account (which included the $199,364.44 from the sale of Suzanne's home on Iberia Lane), a home located at 92 Acadia Lane, Pineville, LA. Bill testified that they also remodeled the Acadia Lane home with money "coming straight out of the [joint] checking account[,]" and that the cost of the additions "were estimated to be Seventy-five Thousand, before [they] started" the construction project.

14

Bill testified that periodic payments made from his ownership interest in Ballard CLC, Inc., BRD Leasing, LLC, and BBPWP, LLC, were deposited into his joint accounts with Suzanne. Bill testified that his living expenses were also paid from his joint account with Suzanne despite the fact that he "had a rudimentary understanding of the balance in that account at all times." When asked if he ever saw the bank statements during his years of marriage with Suzanne, Bill testified:

> Never. . . . I didn't see payroll deposits for myself. I didn't see a -- my bonus deposits. We made bonus deposits, you know. And, uh, and sometimes the bonus deposits were, were hard check. But generally speaking, it's my recollection that they were automatic deposits. I'd get a stub at the office.

Bill also testified that when he asked Suzanne why she withdrew a hundred thousand dollars from their joint checking account to put into her separate account, she told him "that [she] need[ed] to put it in a[n] interest bearing account." When asked about his reimbursement claim for $275,000.00 from BRD Leasing, LLC, Bill testified that Suzanne didn't spend the money but that he "spent it on a house when [he] had to move out of the house that [he] was living in."

Suzanne also testified at trial and provided information about her separate property and the various checking accounts that were used during her marriage to Bill. Specifically, Suzanne testified that prior to her marriage to Bill, she owned her own home located at 112 Iberia Lane in Pineville, LA, which she rented until selling it for $210,000.00 on October 9, 2014. Upon selling her home, Suzanne testified that she deposited $199,364.44 of her separate money into the joint checking account [Capital One Joint Acct. # …xxx1627] that she had with Bill. Suzanne testified that she then transferred the $199,364.44 into a Capital One Interest Bearing Online Savings Account [Capital One Acct. # …xxx0064] in the name of "Suzanne T. Barber," which was an account she had opened prior to her marriage with Bill but that she continued to use throughout the marriage in order for both of them to benefit

15

from the higher interest rate. Specifically, Suzanne testified that the 1627 checking account was bearing 2% interest whereas the 0064 savings account was bearing 5% interest, an amount that more than doubled their interest rate. Even though Suzanne and Bill were benefitting from the higher interest rate, Suzanne testified that she eventually transferred the $199,364.44 back into the joint checking account in order for them to purchase their second home on Acadia Lane. Suzanne testified as follows:

> Q    At the time that you and Bill purchased the Acadia Lane home with the vast majority of your separate funds, had Bill ever accused you of mismanaging money, or trying to steal from him?

> A    Not to my knowledge.

> Q    Do you understand that Bill is currently alleging that you were trying to steal from him during the marriage?

> A    I do.

> Q    Is it true that you've used your own separate money to help Bill?

> A    Yes, sir.

> Q    Have you move[d] money from accounts to try to garner a higher interest rate?

> A    Absolutely.

> Q    And that benefit –

> A    And still do.

> Q    And that benefitted you and Bill.

> A    Correct. Yes, sir.

> Q    Is the money still there?

> A    Yes, sir.

> Q    It's not in an offshore account, in a box hidden somewhere. It's all in the account?

> A    Yes, sir, at Capital One.

16

Suzanne also testified that Bill donated half of his Williford Road home to her on October 31, 2011, because Bill was financially unable to get a loan for the renovations so she "utilized [her] line of credit to refinance Bill's separate property home." Suzanne testified that after Bill's stroke, they decided to sell the Williford Road home and buy the Acadia Lane home using the cash that had been deposited into their joint account following the sale of her separate property on Iberia Lane. Once the Williford home sold, Suzanne testified that they also deposited the net sale proceeds into their joint checking account. Suzanne testified that she and Bill made improvements to the Acadia Lane home and that the renovations cost them "between Eighty and a Hundred Thousand Dollars."

Suzanne testified that although she withdrew $100,000.00 out of the joint checking account and transferred it into her separate account in July 2017, she put the money back into the joint checking account in September 2017 after Bill accused her of stealing the money. Suzanne testified that after she filed for divorce, Bill withdrew $277,250.80 from the joint checking account and deposited it into his separate checking account. Suzanne testified that Bill's withdrawal of $277,250.80 from the joint account most likely entails the $275,000.00 that he claims BRD, LLC paid him in the buy-out.

Suzanne testified that she often used her two separate savings accounts while married to Bill because they received good interest rates. Specifically, Suzanne testified that she opened up a Money Market Savings Account [xxx0007] in the name of "Suzanne Branch" on May 21, 2017, because "Capitol One had a special, that they were offering a high – higher interest rate, so I opened it." Suzanne testified that she deposited both separate and community funds into account 0007 because of the increased interest rate and that, as of September 18, 2017, the 0007 account balance was $10,398.52.

In regard to the Capital One Savings Account [xxx0064], Suzanne testified that she often deposited both separate and community funds into this account because it also provided a higher interest rate than regular accounts. Suzanne testified that as of September 30, 2017, the 0064 account had a community property balance of $285,493.64.

According to counsel for Bill, the basis for filing the Petition for Mismanagement, Bad Faith and Fraud was the transfer of funds from the joint account #1627 to Suzanne's separate account #0064 during the marriage. Although Bill alleges that the 0064 savings account was a secret account, the record indicates that Suzanne listed this account as community property in her second detailed descriptive list that was filed on August 24, 2020, with the account having a balance of $285,493.64. After reviewing the exhibits and lengthy testimony, we find no manifest error in the trial court's decision to dismiss Bill's claims against Suzanne for mismanagement, bad faith and/or fraud. The testimony and bank records reveal that both Bill and Suzanne benefited from the higher return of interest rates that occurred from the transfers between the banking accounts as well as the numerous cash transactions that were made throughout the marriage for the benefit of the community.

Although Bill alleges that Suzanne also violated her fiduciary duties as a mandate, we find no evidentiary basis for this argument. The trial court's findings, including its decision to dismiss Bill's damages claim under La.Civ.Code art. 2354, are reasonably supported by the record. Thus, Bill's first two assignments of error are without merit.

*Reimbursement Claims:*

In his third assignment of error, Bill alleges that the trial court erred in denying his reimbursement claims for the sale proceeds of his separate property that was deposited into the community joint bank account. Bill alleges that the evidence showed what his "reimbursement claims were with respect to the amounts of his separate property that he received during the marriage, [and] the appellee's mismanagement, fraud and bad faith, and her obligation to [Bill] to account for what she did to [him]."

We find no merit to this argument upon finding that both the community and/or separate funds were either returned upon Bill's request or remained in the banking accounts subject to the judicial partition. Accordingly, we find the trial court properly denied Bill's reimbursement claims for the pre-divorce buy out installments from Ballard, LLC and BBPWP, LLC.

For the reasons stated herein, we hereby affirm the trial court judgment that partitioned the community property and dismissed Bill's claims against Suzanne for mismanagement and/or fraud. All costs of this appeal are assessed to Appellant, William "Bill" Howard Branch.

**AFFIRMED.**

This opinion is NOT DESIGNATED FOR PUBLICATION.
Uniform Rules—Courts of Appeal, Rule 2-16.3.

19