NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

23-157

SUSANA F. MOODY

VERSUS

ROSS MOODY

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 2011-0528
HONORABLE LILYNN CUTRER, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

CANDYCE G. PERRET
JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Candyce G. Perret, Jonathan W. Perry, and Wilbur L. Stiles,
Judges.

MOTION TO STRIKE GRANTED.
JUDGMENT AFFIRMED IN PART;
REVERSED IN PART; AND RENDERED.

**Frank Alton Granger**
**1135 Lakeshore Drive, 6th Floor**
**Lake Charles,   LA 70601**
**(337) 439-2732**
**COUNSEL FOR DEFENDANT/APPELLEE:**
    **Ross Moody**

**David Hudson**
**Larry A. Roach, Inc.**
**2917 Ryan Street**
**Lake Charles,   LA 70601**
**(337) 433-8504**
**COUNSEL FOR DEFENDANT/APPELLEE:**
    **Ross Moody**

**Susana F. Moody**
**In Proper Person**
**2922 River Crest Road**
**Corpus Christi,   TX 78415**
**PLAINTIFF/APPELLANT**
**IN PROPER PERSON:**
    **Susana F. Moody**

**PERRET, Judge.**

This appeal is taken following the April 30, 2020 judgment partitioning the community property of Susana Moody ("Susana") and Ross Moody ("Ross"). The judgment also set forth reimbursement claims awarded, and an equalizing payment to be made by Ross to Susana in the amount of $49,829.70. Costs of the proceedings were assessed equally between the parties. Susana filed the appeal, but Ross has also answered the appeal. After review, we affirm in part, reverse in part, and render judgment.

## MOTION TO STRIKE ATTACHMENTS TO APPELLANT BRIEF AND REPLY BRIEF:

Appellee, Ross, moves to strike certain pages of exhibits attached to Appellant's brief and reply brief. Ross notes that Susana has attached several transcript pages, specifically exhibit pages 184-214, which can be found in the record, and proceeded to underline and write comments in the margins. In her reply brief, Susana attaches exhibits which she states were not part of the record. These pages, Ross argues, should be stricken due to improper alteration and improper supplement/expansion of the appellate record.

"It is well settled that pursuant to La. C.C.P. art. 2164, an appellate court must render its judgment upon the record on appeal. . . . The appellate court cannot review evidence that is not in the record on appeal and cannot receive new evidence." *Titlesite LC v. Webb*, 36,437, p. 12 (La.App. 2 Cir. 12/11/02), 833 So.2d 1061, 1068–69. An exhibit must either be admitted into evidence, or specifically designated as a proffer to be considered on appeal. *See Liles v. Great W. Cas. Ins. Co.*, 54,565 (La.App. 2 Cir. 7/13/22), 342 So.3d 1160. "Appellate briefs are not part of [the appellate] record, and facts referenced therein, but not contained *in the record*,

cannot be considered. Nor does an attachment to a litigant's brief constitute part of the record on appeal." *D'Arbonne Bank & Trust Co. v. James*, 597 So.2d 165, 166–67 (La.App. 2 Cir.) (citations omitted), *writ denied*, 604 So.2d 1000 (La.1992).

Pages 184 through 214 are transcript excerpts from the August 20, 2019 trial, which we note is in the record without Susana's notations. As to her exhibits attached to the reply brief, those include a transcript, typed by an unknown person, of telephone recordings left by the court-appointed curator[1] attempting to contact Susana at work; Blue Cross Blue Shield Claims summary for 2015 showing Susana's hospitalizations; and Blue Cross Blue Shield of Texas claims in 2014. Susana admits that these exhibits are not part of the record, and states this is because she was never given the opportunity to present them because the requested continuance of the December 3, 2015 trial was denied.

Based on the above, we grant Appellee's Motion to Strike Improper Attachments to Appellant Brief and Reply Brief. Those exhibits will not be considered in our review, although we do note that the August 20, 2019 transcript found in the record itself, without Appellant's notations, is reviewable.

**FACTS AND PROCEDURAL BACKGROUND:**

Ross Moody and Susana Moody were married on June 29, 2001, and had four children of their marriage. Susana filed a Petition for Divorce on February 3, 2011, alleging physical and emotional abuse, seeking a temporary restraining order, sole custody of the four children, child support, termination of community property, interim spousal support, and final spousal support. Ross subsequently filed an

---

[1] A curator was appointed for service of Ross's Rule to Establish Child Support and Related Financial Obligations and the associated Hearing Officer Conference Order on May 8, 2014, and was also requested in the community property issue as Susana could not be located.

2

Answer and Reconventional Demand alleging abuse as well as seeking joint custody of the children and co-domiciliary status.

A judgment of divorce was rendered on March 6, 2012. On May 15, 2012, Susana filed her detailed descriptive list. On August 3, 2012, Ross filed his detailed descriptive list.

Following a two-day trial, a judgment regarding custody was rendered on March 12, 2014, granting Ross sole custody of all four children, and ordering Susana to leave the marital home. Thereafter, on August 26, 2014, Ross filed a Petition to Partition Community Property. A motion to have a curator appointed for Susana was filed on May 8, 2014. Ross filed a second detailed descriptive list on October 10, 2014.

Ross filed a combined amended detailed descriptive list and traversal on January 8, 2015. On April 21, 2015, a Hearing Officer conference was held wherein the Hearing Officer set values on certain items to be partitioned along with other recommendations.[2] Susana did not appear at this conference, but the curator for Susana was present. This Hearing Officer recommendation became a judgment on May 11, 2015. On August 20, 2015, Susana filed an untimely objection to the Hearing Officer's recommendations regarding child support only. No objection to the Hearing Officer's recommendations regarding the community property partition values was made. Despite being untimely, the objection regarding the child support was set for a hearing, and ultimately continued twice until December 3, 2015. Neither party appeared on that date and the matter was dismissed. Susana also filed

_____

[2] The trial court specifically noted that the Hearing Officer only set values for certain items and did *not* make determinations regarding whether those items were classified as community or separate.

an Exception of Insufficiency of Service of Process regarding the citation for child support only.

On November 11, 2015, Susana challenged the Hearing Officer's recommendation regarding community property and the associated judgment for the first time by filing a Petition to Annul Judgment. Susana asserted that proper service was not made and that she was not aware of the agreement. A Motion for New Trial was also filed on both issues, which was denied. A third motion to continue was filed seeking continuance of the December 3, 2015 hearing date regarding the objection to child support, but due to the original pleading not being filed and costs not being paid, an Order was never signed. No parties appeared for the December 3, 2015 hearing and the matter was dismissed.

Although a consolidated trial began on September 11, 2017, for both the child support and community property partition issues, the trial was bifurcated, and the child support issue proceeded first. Some partition testimony was heard after the bifurcation of the trial, interspersed in the hearings on July 5, 2018, February 5, 2019, and February 6, 2019. The partition trial commenced on August 20 and 21, 2019.

The trial court issued the April 30, 2020 judgment as well as Written Reasons for Judgment. Ross filed a Motion for New Trial on May 15, 2020, which was subsequently denied on December 30, 2020. Prior to the motion for new trial adjudication, Susana filed a Notice of Appeal on June 16, 2020. However, the matter was not lodged, and Susana filed a Motion for Returnable Date for Appeal Lodging on February 13, 2023.

On appeal, Susana asserts fourteen "issues" on appeal, which appear to be her assignments of error. Those issues are summarized as follows:

(1)     The trial court legally erred in failing to consider evidence of the community property partition that was presented in hearings held before August 2019.

(2)     The trial court legally erred in accepting Ross's testimony regarding "necessary" repairs he made to the marital home to put it in "marketable condition," despite the appraisal value remaining the same before and after the repairs.

(3)     The trial court legally erred in dismissing Susana's Updated Detailed Descriptive List.

(4)     The trial court legally erred in accepting the Hearing Officer's recommendations on May 11, 2015, when Susana was not properly served and, thus, did not have the opportunity to traverse or concur in the asset and liability valuation.

(5)     The trial court legally erred in failing to use the market value as of the date of trial in its valuation of the 2008 Honda Odyssey.

(6)     The trial court legally erred in finding that the MobilOil Credit Union Account was the separate property of Ross.

(7)     The trial court legally erred in denying Susana rent credit for Ross's use of the marital home.

(8)     The trial court legally erred in assessing Susana 50% of the cost for Ross's expert accountant witness.

(9)     The trial court legally erred in allowing Ross reimbursement for Susana's removal of $65,000.00 from a community account to pay for living expenses and expenses for the children.

(10)    The trial court erred in classifying assets based on information provided only by Ross, and without permitting Susana to submit supporting evidence or participate in traversal.

(11)    The trial court erred in awarding Ross reimbursements without considering whether community property was originally used to pay for those expenses.

(12)    The trial court erred in awarding Ross reimbursement for storage fees of movables to be returned to Susana.

(13)    The trial court erred in failing to award Susana reimbursements for her payment of community expenses.

(14)    The trial court erred in denying Susana a fair and equitable partition by denying her motions and ignoring her allegations of abuse and financial struggles.

Susana also asserts that the trial court erred in taking as fact statements made only by Ross and information he provided to the accountant, without supporting documentation, as well as in denying Susana the opportunity to hire her own accountant.

Additionally, in his Answer to Appeal, Ross sets forth the following assignments of error:

(1)    The trial court erred in determining/allocating the mortgage balance owed on the marital home as of the date of trial.

(2)    The trial court erred in determining/allocating Dr. John Simoneaux's fees and in failing to credit Ross in the partition by reducing the equalization payment owed to Susana.

(3)    The trial court erred in determining/allocating Dr. Patricia Post's fees for her testimony at the child support trial in 2017-2018, and in failing to credit Ross in the partition by reducing the equalization payment owed to Susana.

(4)    The trial court erred in denying Ross's claim for rental reimbursement during Susana's exclusive use of the marital home. Ross's testimony regarding a fair rental value was uncontroverted and should not have been disallowed.

## STANDARD OF REVIEW:

"The trial court is vested with great discretion in effecting a fair partition of community property." *Arterburn v. Arterburn*, 15-22, p. 4 (La.App. 3 Cir. 10/7/15), 176 So.3d 1163, 1167. We review the trial court's classification of property as community or separate using the manifest error standard of review. *Thomasee v. Thomasee*, 22-159 (La.App. 3 Cir. 10/12/22), 362 So.3d 797, *writ denied*, 23-29 (La. 3/7/23), 357 So.3d 351. Additionally, the factual findings and credibility determinations made by the trial court in valuing and allocating assets and liabilities are also reviewed for manifest error. *See Id*.

Under the manifest error standard, the appellate court does not set aside the trial court's factual findings unless (1) a reasonable factual basis for the finding does

6

not exist in the record, and (2) the record establishes that the finding is clearly wrong.

*See Arterburn*, 176 So.3d 1163.

## DISCUSSION:

Louisiana Revised Statutes 9:2801 regarding the partition of community property states:

A. When the spouses are unable to agree on a partition of community property or on the settlement of the claims between the spouses arising either from the matrimonial regime, or from the co-ownership of former community property following termination of the matrimonial regime, either spouse, as an incident of the action that would result in a termination of the matrimonial regime or upon termination of the matrimonial regime or thereafter, may institute a proceeding, which shall be conducted in accordance with the following rules:

(1)(a) Within forty-five days of service of a motion by either party, each party shall file a sworn detailed descriptive list of all community property, the fair market value and location of each asset, and all community liabilities. For good cause shown, the court may extend the time period for filing a detailed descriptive list. If a party fails to file a sworn detailed descriptive list timely, the other party may file a rule to show cause why its sworn detailed descriptive list should not be deemed to constitute a judicial determination of the community assets and liabilities. At the hearing of the rule to show cause, the court may either grant the request or, for good cause shown, extend the time period for filing a sworn detailed descriptive list. If the court grants the request, no traversal shall be allowed.

(b) Each party shall affirm under oath that the detailed descriptive list filed by that party contains all of the community assets and liabilities then known to that party. Amendments to the descriptive lists shall be permitted. No inventory shall be required.

(2) Within sixty days of the date of service of the last filed detailed descriptive list, each party shall either traverse or concur in the inclusion or exclusion of each asset and liability and the valuations contained in the detailed descriptive list of the other party. For good cause shown, the court may extend the time period for a party to traverse or concur in the detailed descriptive list of the other party. The trial of the traverses may be by summary procedure. At the trial of the traverses, the court shall determine the community assets and liabilities; the valuation of assets shall be determined at the trial on the merits. The court, in its discretion, may by ordinary procedure try and determine at one hearing all issues, including those raised in the traverses.

7

(3) The court may appoint such experts pursuant to Articles 192 and 373 of the Louisiana Code of Civil Procedure as it deems proper to assist the court in the settlement of the community and partition of community property, including the classification of assets as community or separate, the appraisal of community assets, the settlement of the claims of the parties, and the allocation of assets and liabilities to the parties.

(4) The court shall then partition the community in accordance with the following rules:

(a) The court shall value the assets as of the time of trial on the merits, determine the liabilities, and adjudicate the claims of the parties.

(b) The court shall divide the community assets and liabilities so that each spouse receives property of an equal net value.

(c) The court shall allocate or assign to the respective spouses all of the community assets and liabilities. In allocating assets and liabilities, the court may divide a particular asset or liability equally or unequally or may allocate it in its entirety to one of the spouses. The court shall consider the nature and source of the asset or liability, the economic condition of each spouse, and any other circumstances that the court deems relevant. As between the spouses, the allocation of a liability to a spouse obligates that spouse to extinguish that liability. The allocation in no way affects the rights of creditors.

(d) In the event that the allocation of assets and liabilities results in an unequal net distribution, the court shall order the payment of an equalizing sum of money, either cash or deferred, secured or unsecured, upon such terms and conditions as the court shall direct. The court may order the execution of notes, mortgages, or other documents as it deems necessary, or may impose a mortgage or lien on either community or separate property, movable or immovable, as security.

(e) In the event that the allocation of an asset, in whole or in part, would be inequitable to a party, the court may order the parties to draw lots for the asset or may order the private sale of the asset on such terms and conditions as the court deems proper, including the minimum price, the terms of sale, the execution of realtor listing agreements, and the period of time during which the asset shall be offered for private sale.

(f) Only in the event that an asset cannot be allocated to a party, assigned by the drawing of lots, or sold at private sale, shall the court order a partition thereof by licitation. The court may fix the minimum bids and other terms and conditions upon which the property is offered at public sale. In the event of a partition by licitation, the court shall expressly state the reasons why the asset cannot be allocated, assigned by the drawing of lots, or sold at private sale.

B. Those provisions of a domestic relations order or other judgment which partitions retirement or other deferred work benefits between former spouses shall be considered interlocutory until the domestic relations order has been granted "qualified" status from the plan administrator and/or until the judgment has been approved by the appropriate federal or state authority as being in compliance with applicable laws. Amendments to this interlocutory judgment to conform to the provisions of the plan shall be made with the consent of the parties or following a contradictory hearing by the court which granted the interlocutory judgment. The court issuing the domestic relations order or judgment shall maintain continuing jurisdiction over the subject matter and the parties until final resolution.

C. In the absence of an agreement between the parties for an extension of time or the granting by the court of an extension for good cause, if a party fails to comply with any time limit provided in this Section, upon motion of the other party or upon its own motion, the court may award reasonable attorney fees and court costs to the other party for the filing of or the response to the motion. If the court rules, pursuant to Subparagraph (A)(1)(a) of this Section, that the other party's sworn detailed descriptive list be deemed to constitute the assets and liabilities of the community, then the court shall not award attorney fees and court costs to the other party.

Regarding a spouse's entitlement to reimbursement, "[t]he party seeking reimbursement has the burden of proving '*by a preponderance of the evidence* the nature of the indebtedness, whether the community obligation(s) were incurred for the ordinary and customary expenses of the marriage.'" *Harriss v. Harriss*, 16-9, p. 5 (La.App. 3 Cir. 10/12/16), 204 So.3d 209, 214 (quoting *Krielow v. Krielow*, 93-2539 (La. 4/11/94), 635 So.2d 180, 187). Furthermore, the party seeking reimbursement of separate funds expended on a community obligation "must prove 'that separate funds existed and that those funds were used to satisfy [the] community obligation.'" *Id*. (quoting *Williams v. Williams*, 07-541, p. 2 (La.App. 3 Cir. 10/31/07), 968 So.2d 1234, 1236. The trial court's findings on these issues are reviewed using the manifest error standard of review. *Id*.

9

**SUSANA MOODY'S APPELLATE BRIEF**

In her brief, Susana argues issues aside from those specified above, particularly that the trial court failed to recognize her economic condition, that Ross would "take" any money received by Susana, as exhibited by the MobilOil Credit Union transfers. Despite Susana's paychecks being directly deposited into the same account, that account was determined to be Ross's separate property.

Furthermore, Susana argues that the trial court erred in not assigning the value of the community property at the time of the trial, and instead used Ross's detailed descriptive list, which Susana was not permitted to traverse. Susana alleges there is plenty of evidence to show that Ross provided false information; thus, the entire list should be revised and reconsidered. Susana also asserts that testimony and evidence supported a finding that Ross used community property to pay taxes for capital gains earned from the Ameritrade Investment account; yet, the trial court stated that no testimony/evidence was presented so the claims were dismissed.

Without specifics, Susana argues that the court committed multiple errors because it based its findings "on the testimony or information provided by one person . . . without any supporting evidence . . . and it was proven . . . that he withheld information repeatedly and omitted producing documents which would not favor him."

The above arguments overlap with several of the issues presented by Susana; thus, we will discuss those issues within the different assignments of error addressed below. We also note that Susana does re-list her fourteen errors and provides a sentence or two explaining why the trial court erred in each, insofar as this can be considered "briefing" the issue under our rules, instead of abandoning it, we will address those below.

**Assignment of Error No. One:**

Susana asserts that the trial court failed to recognize that the partition trial began September 2017, before it was decided to bifurcate the trial. She points to no specific evidence in support, instead merely stating: "There is evidence and testimony in the record that shows it." She asserts that it is clear the court did not take any evidence presented prior to August 2019 "into consideration based on the written reasons for judgment."

A review of the written reasons shows that the trial court was well aware that the trial on the partition occurred on several days, and in different years: "The trial on the community property partition began in September 2017, along with the trial on the setting of child support. . . . Trial on the community property partition resumed on August 20, 2019, and finished on August 21, 2019." In fact, the trial court referenced testimony that appeared in the September 2017 hearing, such as Susana's testimony that she deposited $10,000 into the TD Ameritrade account 5508.

Considering the above, we find no merit in this assignment of error.

**Assignment of Error No. Two:**

Susana asserts that the trial court erred in using the stipulated appraisal value of $225,000 for the marital home instead of increasing the value based on the repairs that Ross made and asserted were necessary to bring the home to market. Susana argues the appraisal occurred before the repairs, so the value should have increased.

Ross argues that the parties agreed the appraisal value was what the home would be worth if it was brought into marketable condition and that certain repairs were required to achieve this.

At trial, Ross agreed that the value of $225,000 "was stipulated with the understanding that that was if the home was brought into marketable condition," and

11

he noted that he "wouldn't have agreed otherwise." He further stated that, at the time, he had "in hand, estimates of what it would take to bring the home into marketable condition." Since that time, Ross has made repairs to the home, some of which he did himself, and provided receipts for those repairs as evidence. Ross also clarified that he has made no major repairs beyond what he had estimated as necessary to bring the home into marketable condition.

Susana did not have any evidence contradicting the repairs Ross alleged he made, or the receipts, but suggested that repairs were only necessary because Ross refused to fix the house sooner. When asked if she understood the stipulated home value took into consideration the necessity of repairs to bring it into marketable condition, she responded that she "never saw that."

The trial court made a factual finding that the parties stipulated to the value of the home assuming it would be brought into marketable condition. Based on the record, we cannot say this finding was manifestly erroneous.

**Assignment of Error No. Three:**

In her third assignment of error, Susana asserts the trial court erred in dismissing her updated detailed descriptive list when the trial court requested updated lists. In fact, the list was admitted into evidence by Ross as Ross #7. Although Susana cites the August 20, 2019 transcript in support of her claim, there is no page number listed and this court does not find that the trial court ever "dismissed" her list. When Susana was questioned by opposing counsel, opposing counsel used her updated detailed descriptive list to review her claims. Opposing counsel offered the list into evidence, and the trial court stated, "That's what I went through." Furthermore, during Ross's testimony, he admitted that his list contains handwritten corrections made after receiving Susana's updated list with "new

numbers on a few items that [he was] willing to accept[.]" Thus, there is simply no merit to this assignment of error.

**Assignment of Error No. Four:**

Susana asserts that the trial court erred in accepting the Hearing Officer's April 2015 recommendations when Susana was not properly served, was unaware of the hearing, and did not participate in the hearing. Those recommendations were not timely objected to; thus, the recommendations became a final judgment which was signed by the trial court on May 11, 2015.[3] Furthermore, she asserts that the trial court erred in denying her motion to continue the hearing set for December 3, 2015, due to her failure to pay costs.

Ross filed his petition to partition the community property on August 26, 2014. Susana's attorney had withdrawn from the suit on April 23, 2014. A curator had already been appointed for service of Ross's Rule to Establish Child Support and Related Financial Obligations and the associated Hearing Officer Conference Order on May 8, 2014. As Susana could not be located, Ross requested the curator be continued in the community property issue.

A curator may be appointed when:

> A. The court shall appoint an attorney at law to represent the defendant, on the petition or ex parte written motion of the plaintiff, when:

> (1) It has jurisdiction over the person or property of the defendant, or over the status involved, and the defendant is:

> (a) A nonresident or absentee who has not been served with process, either personally or through an agent for the service of process, and who has not waived objection to jurisdiction.

---

[3] "If no written objection is filed to the hearing officer's written recommendations or judgment of the domestic commissioner, the written recommendations shall become a final judgment of the court and shall be signed by a judge and shall be appealable as a final judgment." La.Dist.Ct.R. 34.1. *See also* La.R.S. 46:236.5.

(b) An unemancipated minor or mental incompetent who has no legal representative, and who may be sued through an attorney at law appointed by the court to represent him.

(c) Deceased and no succession representative has been appointed.

(2) The action of proceeding is in rem and:

(a) The defendant is dead, no succession representative has been appointed, and his heirs and legatees have not been sent into possession judicially.

(b) The defendant is a corporation, a limited liability company, or partnership on which process cannot be served for any reason.

(c) The defendant's property is under the administration of a legal representative, but the latter has died, resigned, or been removed from office and no successor thereof has qualified, or has left the state permanently without appointing someone to represent him.

B. All proceedings against such a defendant shall be conducted contradictorily against the attorney at law appointed by the court to represent him. For the limited purpose of any such action or proceeding, the appointed attorney at law shall be the proper representative of the succession of any such decedent to the same extent as if he were the regularly appointed and duly qualified administrator or executor in such decedent's succession.

C. The improper designation of the attorney appointed by the court to represent such a defendant as curator ad hoc, tutor ad hoc, special tutor, or any other title, does not affect the validity of the proceeding.

D. The improper designation of a defendant for whom an attorney has been appointed by the court in an action or proceeding in rem under Paragraph (A)(2) of this Article shall not affect the validity of the proceedings and any judgment rendered therein shall be binding upon the parties and property involved in the action or proceeding in rem. Therefore, naming an attorney to represent the unopened succession of the defendant, the succession of the defendant, the estate of the defendant, the deceased defendant, or any other similar designation or appellation shall satisfy the requirements of Paragraph (A)(2)(a). The designation of a corporation or a partnership by a name sufficient to identify the same to a reasonably prudent man, regardless of any errors which it might contain, shall satisfy the requirements of Paragraph (A)(2)(b).

Louisiana Code of Civil Procedure Article 5091.

The curator provided two letters to the court detailing his efforts in trying to locate and contact Susana. One letter was provided regarding the support issues and one letter was provided regarding the partition issue.[4] The letters noted that he was aware that service via the long arm statute failed, other mail sent to Susana's last known address had been returned, that he conducted internet searches for her, and that he left detailed voice messages with the numbers believed to be Susana's parents as well as her sister, who he did in fact make contact with once. He also filed a response to Ross's amended detailed descriptive list.

The April 21, 2015 hearing with the Hearing Officer occurred without participation from Susana, but the curator was present. No timely appeal was taken regarding the Hearing Officer's recommendations; thus, those recommendations became a judgment on May 11, 2015. On August 20, 2015, Susana filed an objection to the Hearing Officer's recommendations regarding *child support*. No objection to the Hearing Officer's recommendations regarding the community property partition values was made until November 11, 2015, when Susana challenged the Hearing Officer's recommendation regarding community property and the associated judgment for the first time by filing a Petition to Annul Judgment. The Petition to Annul Judgment was denied, as was the subsequent Motion for New Trial alleging failure of service.

At trial, Susana testified that following the award of custody to Ross in March of 2014, she moved to Texas, changed her phone number, changed her email address, and changed her mailing address. She further denied being in contact with her sister.

---

[4] The letter regarding the curator's efforts in the partition issue referenced his prior letter to the court, and including his additional attempts made to locate Susana.

Susana asserts the trial court erred in accepting the Hearing Officer's recommendations as a judgment because she could not be located to participate and traverse Ross's detailed descriptive list. Multiple attempts were made to locate Susana to no avail, the curator was present at the hearing on Susana's behalf, and no timely appeal of the recommendation was made. "If no written objection is filed to the hearing officer's written recommendations or judgment of the domestic commissioner, the written recommendations shall become a final judgment of the court and shall be signed by a judge and shall be appealable as a final judgment." La.Dist.Ct.R. 34.1. *See also* La.R.S. 46:236.5. Thus, based on the record we cannot say the trial court erred in its appointment of the curator or its acceptance of the Hearing Officer's recommendation as judgment.

As to the denial of her motion to continue the December 3, 2015 hearing, La.Code Civ.P. arts. 1601 and 1602 provide grounds for a motion to continue. Article 1601 provides that "[a] continuance may be granted in any case if there is good ground therefor." Article 1602 provides peremptory grounds for a continuance:

> A continuance shall be granted if at the time a case is to be tried, the party applying for the continuance shows that he has been unable, with the exercise of due diligence, to obtain evidence material to his case; or that a material witness has absented himself without the contrivance of the party applying for the continuance.

Regarding the alleged December 3, 2015 hearing and the denial of the motion to continue, while the faxed copy of the motion to continue is in the record, it was never followed by an original copy within five days and it was not filed with the costs. While there are no minutes associated with the December 3, 2015 hearing in the record on appeal, the trial court addressed what occurred at trial on July 5, 2018. Neither party appeared on December 3, 2015, and the matter was dismissed. This court cannot determine whether any issues pertinent to community property were

16

additionally set for this date. As previously mentioned, it appears what was set for December 3, 2015, was Susana's objections filed August 20, 2015. Although untimely, the trial court did set a hearing date for that pleading, which was continued twice until December 3, 2015. The August 20, 2015 pleading only objected to the child support recommendation made by the Hearing Officer, not the community partition. Thus, we cannot say that the trial court erred in denying the motion to continue, or whether that hearing would have been pertinent to the issues at hand.

**Assignment of Error No. Five:**

In her fifth assignment of error, Susana asserts the trial court erred in accepting the Hearing Officer's 2015 recommended value of $15,000 for the 2008 Honda Odyssey instead of the market value of the vehicle at the time of trial. In her updated detailed descriptive list dated August 18, 2019, Susana values the Odessey at $2,820. She cites *Darden v. Darden*, 48,971 (La.App. 2 Cir. 5/14/14), 139 So.3d 33, and La.R.S. 9:2801(A)(4)(a) in support of her argument that the parties' assets should be valued as of the time of trial on the merits.

In this case, several of the parties' assets were valued at the Hearing Officer Conference on April 21, 2015. Those values were finalized when the recommendations became a final judgment on May 11, 2015. The 2008 Honda Odyssey was one of those items. The Hearing Officer considered Susana's 2012 detailed descriptive list as well as Ross's updated detailed descriptive list. Both parties valued the Odyssey at $15,000. This particular valuation was signed as a judgment on May 11, 2015, after no timely objection to the hearing officer's recommendation was made. No appeal was taken from that judgment. Thus, the trial court did not err in using this value in the final partition.

17

**Assignment of Error No. Six:**

In her sixth assignment of error, Susana asserts that the trial court erred in determining that the MobilOil Credit Union Account was Ross's separate property. Susana asserts that the evidence showed Ross transferred money from Susana's separate account into his Mobil Oil Credit Union Account. Furthermore, Susana asserts her paychecks were eventually directly deposited into the MobilOil account as well.

First, we note that nowhere in the judgment or written reasons is the MobilOil account, as a whole, determined to be Ross's separate property. In fact, neither party lists the MobilOil account at all as an asset of either party or of the community. Thus, we assume that Susana means to argue that the trial court erred in determining $10,000.00 which was withdrawn from the MobilOil account during the marriage and transferred to the TD Ameritrade 5508 account was Ross's separate property.

The trial court reviewed the evidence and testimony, which included multiple days of Susana's testimony. Susana challenged the expert accountant's, Mr. Robert Ehlers, finding that the $10,000.00 transfer out of the MobilOil account was a transfer of Ross's separate property because the MobilOil account was a community account where their funds were comingled. However, it was Mr. Ehlers' determination that the $10,000.00 was Ross's separate property, already existing in the MobilOil account, prior to the marriage. He explained that while some of Susana's funds may have been transferred into Ross's account, the MobilOil account never got below $10,000.00. Thus, that $10,000.00 remained separate property.

To determine the classification of this $10,000.00 contribution, the parties submitted the MobilOil statements for the court's review. The statement from June 2001, of Ross's account shows that there are two accounts "Acct 1" and "Acct 10."

18

Mr. Ehlers described the accounts as basically a checking and a savings account. The June 1, 2001, through June 30, 2001, previous balances were $13,977.26 and $5,579.19 respectively. On June 30, 2001, the new balances were $9,068.85 and $12,006.56 respectively. The parties were married on June 29, 2001.

Susana provided her bank account number to show that transfers were made from her account into that of Ross's MobilOil account. However, even subtracting those transfers, Ross's accounts, combined, were never less than $10,000.00, corroborating Mr. Ehlers' testimony. After December 2001, the transfers from Susana's account stopped, but it appears, as she testified, her payroll was then directly deposited into Ross's account, as was his own payroll.

In January 2002, a third account, Acct #19 was established. Thereafter, the three accounts remained significantly above $10,000.00. In September 2002, approximately $30,000.00 was withdrawn, but the remainder in the accounts still surpassed $10,000.00.

Therefore, based on the evidence in the record and even acknowledging Susana's contributions to the MobilOil account, using the last in first out method, Ross's original and separate money in the account prior to the marriage, was never spent during the marriage prior to 2003. Susana presented no other evidence or testimony to contradict Mr. Ehlers' calculations. Accordingly, when Ross transferred $10,000.00 from the MobilOil account to the Ameritrade 5508 account in 2003, it is a reasonable conclusion that those were Ross's separate funds. We find no error in the trial court's finding that the $10,000.00 transfer was Ross's separate property.

**Assignment of Error No. Seven:**

In her seventh assignment of error Susana asserts that the trial court erred in denying her claim for rental value of the marital home while Ross had exclusive use of the home pending the partition trial. Susana suggests that the court erred because it clearly did not consider her economic situation and favored Ross in permitting him a mortgage payment reimbursement. Susana made a claim for rental credit for the first time in her updated detailed descriptive list signed August 18, 2019, and filed during the partition trial. The trial court denied Susana's claim, finding that she did not reserve her right to a rental credit.

Louisiana Revised Statutes 9:374(C) (emphasis added), as it was written during the time of trial and signing of the judgment, provided:[5]

> A spouse who, in accordance with the provisions of Subsection A or B of this Section, uses and occupies or is awarded by the court the use and occupancy of the family residence, a community immovable occupied as a residence, or a community manufactured home as defined in R.S. 9:1149.2 and occupied as a residence, regardless of whether it has been immobilized, shall not be liable to the other spouse for rental for the use and occupancy, except as hereafter provided. **If the court awards use and occupancy to a spouse, it shall at that time determine whether to award rental for the use and occupancy and, if so, the amount of the rent.** The parties may agree to defer the rental issue for decision in the partition proceedings. **If the parties agreed at the time of the award of use and occupancy to defer the rental issue, the court may make an award of rental retroactive to the date of the award of use and occupancy.**

Ross was awarded exclusive use and occupancy of the home in the March 12, 2014 judgment. At that time, Susana had not made a rental reimbursement claim. Additionally, no contemporaneous award of rental reimbursement was made by the trial court nor does there appear to be an agreement between the parties that rent

---

[5] The current version of La.R.S. 9:374 became effective August 1, 2022. The current statute appears to significantly change the language of the prior version.

would be owed, as in *Gallaty v. Gallaty*, 11-1640 (La.App. 4 Cir. 10/3/12), 101 So.3d 501, or *Averill v. Averill*, 18-299 (La.App. 1 Cir. 9/21/18) (unpublished opinion)(wherein the parties consented to deferring the rental reimbursement issue until the partition proceedings instead of deciding the issue contemporaneously with the award of the use and occupancy of the home).

Considering the law above and the timing of Susana's claim for rental reimbursement, we cannot say that the trial court erred in finding that Susana failed to reserve her claim and in denying her rental reimbursement.

**Assignment of Error No. Eight:**

Susana asserts that the trial court erred in assessing her fifty percent of the costs for the accountant expert witness, Robert Ehlers. In support, Susana argues that the accountant was hired by Ross, only considered documentation and information provided by Ross, and that the accountant did not request any information from Susana.

Mr. Ehlers was the expert certified accountant who testified at trial regarding the parties' TD Ameritrade accounts and one employer-sponsored deferred compensation account. Mr. Ehlers analyzed the account contributions, classified them as either community or separate property, then analyzed the dividends and interest earned on the accounts. His costs totaled $18,562.50. Susana did not present an expert accountant at trial. The trial court did not assess Mr. Ehlers' costs as court costs but considered his invoice a community obligation and permitted Ross reimbursement of one half of the total which he had already paid.

Although Ross provided Mr. Ehlers with all documentation and information, Mr. Ehlers did testify that he contacted Julie Gray, who he believed to be Susana's CPA in Houston. Mr. Ehlers testified that he sent her a copy of his spreadsheet as

21

well as all the data, had several communications with her via email and telephone, but never received any documents from her or Susana or any corrections to his work.

Furthermore, Susana was able to cross-examine Mr. Ehlers, and Mr. Ehlers even provided a recalculation to the court based on information provided by Susana. Specifically, after cross-examination by Susana's counsel regarding the origin of approximately $82,000 alleged to be separate property that rolled over into a Vanguard account, and upon the suggestion that the sum was not Ross's separate property, Mr. Ehlers did a recalculation of that account assuming the $82,000 was community property. This recalculation was introduced as Susana #3, whereas the original calculation was admitted as Ross #5. In fact, the trial court ultimately used Susana #3, the recalculation, in its final determination and in finding that the amount was community.

Considering the necessity of Mr. Ehlers's testimony in classifying and calculating the values of these accounts, the traversal of Mr. Ehlers and his work accomplished on cross examination, and the trial court's finding "that [Mr. Ehlers's] evaluations were beneficial to both parties in that it helped establish the community values in accounts that benefitted both parties," we cannot say that the trial court was manifestly erroneous in labeling Mr. Ehlers's costs as a community obligation.

**Assignment of Error No. Nine:**

Susana alleges that the trial court erred in granting Ross reimbursement for Susana's removal of $65,000.00 from a community account to pay for living expenses and expenses for the children. The value was established in the May 11, 2015 judgment. It seems that Susana argues that she should not owe Ross reimbursement because she took the money to pay for the house, the children,

22

medical expenses, utilities, and her general costs of living because she was unemployed.

At trial, Susana testified that, prior to filing for divorce, she was advised by an attorney to remove the funds to pay for her expenses since she was not employed. Susana removed the funds from a community account. She further testified that as of the day of trial, she did not have any of these funds remaining in her possession. Susana acknowledged that, during the time she was in possession of these funds, Ross was paying her an approximate total of $2,500.00 per month for child support and spousal support. Eventually, the Hearing Officer recommended that Ross pay the mortgage note in lieu of spousal support. Additionally, the trial court granted Susana a reimbursement claim for half of the mortgage notes that she paid on the home, despite Susana failing to introduce evidence of said payments. Instead, Ross acknowledged that Susana made at least $12,878.45 in payments between March 1, 2011, and April 2, 2012.

There is simply no evidence submitted to show how Susana spent the $65,000.00, or that it was spent on community debts. If community funds are used to pay for separate obligations, the other spouse is entitled to a reimbursement of one half the value of the property. La.Civ.Code art. 2364. Even her own testimony is just general categories of items, with no specific amounts or bills. Without more, we cannot say that the trial court erred in finding that Susana owed half of the $65,000.00 as reimbursement to Ross.

**Assignment of Error No. Ten:**

Susana asserts that the trial court erred in classifying assets as community or separate based only on information provided by Ross, without supporting evidence and without providing Susana an opportunity to respond or to participate in traversal.

She does not specifically state which assets she believes were improperly categorized, but merely references her Exhibit W, pages 184 through 217. We previously struck pages 184 through 214 from her brief for the reasons provided above. We reiterate that those pages are transcript pages from the August hearing, and are found in the record, but they were struck from Susana's brief due to alterations she made on the exhibit.

The only indication of which assets she may be referring to can be found under "Assignments of Errors" in her brief, wherein she asserts that "the Trial Court committed multiple legal errors by taking as facts statements made only by appellee and verbal information provided by appellee to the accountant he hired without entering supporting account statements or documentation into the record that proved the information given by appellee was authentic or real." As previously discussed, Susana's counsel cross-examined Mr. Ehlers, the expert accountant, at trial and provided additional information for his consideration.

Mr. Ehlers examined three accounts, two TD Ameritrade accounts and the Vanguard account. After examining one of the TD Ameritrade accounts, Mr. Ehlers opined that it was all community property. Furthermore, regarding the Vanguard account, the trial court clearly accepted Susana's testimony regarding the initial funds to begin that account, as it determined that the initial $82,441.02 was community, disregarding Ross's claim that those funds were separate. Thus, the trial court did not rely solely on information provided by Ross in determining whether this asset was community or separate and Susana was clearly permitted to provide evidence during trial and did, in fact, participate in the cross-examination of this witness. Therefore, the only account Susana would likely have a complaint about

24

would be the TD Ameritrade ending in 5508, which the court classified as the separate property of Ross.

Regarding the Ameritrade 5508 account, Mr. Ehlers testified that this account is basically a savings account, not a deferred compensation plan like the Vanguard account. Mr. Ehlers classified the contributions to the account as well as the interest and dividends earned on the account. As summarized by the trial court, Mr. Ehlers explained:

> [A]ll of the contributions were pre-community by Ross. Since there were distributions from this account using LIFO, last in first out, he determined that all of the community portion of the account was distributed. So, as of the date of trial, the remainder in the account, $131,391.69, is Ross's separate property.

The trial court reviewed the evidence and testimony, which included multiple days of Susana's testimony. Susana challenged Mr. Ehlers's finding that all contributions to the Ameritrade 5508 account were pre-community by Ross. Susana specifically points out that $10,000.00 was transferred from a MobilOil Credit Union account into the Ameritrade 5508 account on June 12, 2003, during the marriage. She asserts that the MobilOil account was community. However, it was Mr. Ehlers's determination that the $10,000.00 was Ross's separate property, already existing in the MobilOil account, prior to the marriage. He explained that while some of Susana's funds may have been transferred into Ross's account, Ross's MobilOil account never got below $10,000.00. Thus, that $10,000.00 remained separate property. Aside from the $10,000, no other contributions were made to the Ameritrade 5508 account during the marriage.

As previously explained in Assignment of Error No. Six, we find no error in the trial court's finding that the $10,000.00 transferred from the MobilOil account to the Ameritrade 5508 account was Ross's separate property. Thus, regarding the

25

Ameritrade 5508 account, as Mr. Ehlers concluded, all contributions to that account were from Ross's separate property. According to Mr. Ehlers, the community portion of the 5508 account was distributed during the marriage, leaving only Ross's separate property in the account. Therefore, when the 5508 account was being used after the termination of the community regime to pay for court-ordered items such as the $20,000 to Susana to assist her in finding housing, that money was Ross's separate property.

After a review of the record, we cannot say that the trial court erred in classifying the Ameritrade 5508 account as Ross's separate property after it clearly considered information provided by both parties.

**Assignment of Error No. 11:**

In her eleventh assignment of error, Susana alleges that the trial court awarded Ross reimbursements without considering whether community property was used to pay for those expenses. Specifically, Susana alleges that Ross used funds out of the TD Ameritrade 5508 account to pay for community expenses and that, based on Mr. Ehlers's testimony, that account had community funds in it. She then asserts that Mr. Ehlers determined the Ameritrade 5508 account exhausted all community funds during the marriage without any supporting evidence being presented.

The issue of the TD Ameritrade 5508 account was discussed at length in both Assignments of Error Numbers Six and Ten. Mr. Ehlers testified that all contributions to the 5508 account were made with Ross's separate property, and any distributions from this account classified as community property were distributed during the community property regime using the last in first out method. Thus, any funds remaining in this account after the termination of the community property regime were Ross's separate property. Therefore, Ross may assert a reimbursement

26

claim for any community obligations paid with money from the TD Ameritrade 5508 account after the termination of the community property regime. We find no error in the trial court's award of reimbursements to Ross based on the use of these funds for community obligations or Susana's separate obligations.[6]

Susana also argues within her brief that the trial court erred in dismissing her allegation that Ross used community property to pay the taxes on capital gains earned from the Ameritrade Investment account. Susana alleges that the trial court stated no testimony or evidence was presented so the claims were dismissed.

Susana does specifically argue that "Ameritrade documents and tax returns during the years of marriage showing tax payments with community funds for capital gains earned from the Ameritrade account were included." First, we note that there is more than one TD Ameritrade account involved in this litigation and Susana does not identify the accounts by number. One, account 5508, was determined to be Ross's separate property as previously discussed at length, and another, a Roth IRA, was determined to be community and awarded to Susana.

There was testimony regarding the sale of Sirius XM stock within the TD Ameritrade 5508 account, and whether community property was used to pay for the capital gains. Susana relied on a Schedule D in her testimony. Mr. Ehlers testified that Schedule D simply reports trades, sales of capital assets (a stock, bond). Mr. Ehlers further testified that, looking only at the Schedule D worksheet, there is not per se a way to actually determine how much money was in the account or how much

_____

[6] The Written Reasons note several times where Ross used TD Ameritrade 5508 account funds to pay for community obligations or Susana's separate obligations: a portion of the down payment for the marital home, a $20,000.00 advance to Susana ordered by the March 12, 2014 custody judgment so she could obtain housing and for her support, and the children's daycare and counseling/therapy with Dr. Simoneaux.

value was in the account. Mr. Ehlers explains that "there is a tax paid on the difference between what you bought it for and what you sold it for. . . . And it's reflected on that Schedule D." He further testified that "the taxpayer who is making the trades, they're paying the tax on the – on the gains."

Mr. Ehlers was shown a tax return from 2012 reflecting shares sold of Ameritrade at a cost of $358.91. However, Mr. Ehlers testified that he cannot determine which of the two Ameritrade accounts that came from. Furthermore, Mr. Ehlers was asked a series of hypotheticals, without being provided a specific document, regarding if the community pays a debt declared a separate debt, would it complicate the classification of the account or the reimbursement issue. Mr. Ehlers explained as best he could based on the hypotheticals he was presented and after specifying that he was "not 100 percent sure that's what you're asking":

> [I]t could be a combination of community and separate. It could be a ratio, much like the Sims calculation that we're doing. And it could be - - if - - if 10 percent of it was determined to come from separate and 90 percent from community, I support we'd have to look again to the flow of funds, what - - what flow methodology, last in, first out . . .

On redirect, the previous question was clarified as being a "possible scenario of the community paying a tax burden during the marriage in connection with trading of separate assets[.]" He was then posited another hypothetical:

> Q. . . . If he has filed taxes since the separation that have included these capital gains and losses on not only his separate accounts but also the community portions of the accounts under his control, then is it reasonable to assume that he has also paid taxes out of his separate income for the past few years on the community capital gains?
>
> A. I think that's reasonable. . . .
> Q. And you don't have the ability, as you sit here today with the information you have, to say if a strict calculation were done on, not only his accounts, but her's as well, where we would land on those reimbursement claims, correct?

A.    I can't answer that. . . . I don't have enough information to compute that.

We reiterate that Susana's brief is unclear regarding which reimbursements, specifically, she is challenging.  Regarding the alleged payment of taxes on TD Ameritrade 5508 capital gains with community funds, considering the evidence and testimony provided, specifically Mr. Ehlers's testimony that he cannot determine, based on the tax return shown to him, which of the two Ameritrade accounts costs came from, we cannot say that community funds were used to pay a separate obligation of Ross.  Furthermore, as to any other reimbursements awarded to Ross, for the foregoing reasons, we continue to find no error in the trial court's award of reimbursement claims to Ross.

Furthermore, we note that the trial court also found no evidence regarding several accounts and stocks.  We agree that there was simply no clear evidence regarding these assets and find no error in the trial court's judgment.

**Assignment of Error No. 12:**

In her twelfth assignment of error, Susana argues the court erred in granting Ross reimbursement for storage fees.  Susana asserts this finding was in error because Ross never informed Susana that he had a storage unit with her belongings and asserts he should not receive this credit when he admitted to disposing of Susana's belongings and receiving a charitable credit for them.

The Hearing Officer's recommendation regarding Susana's belongings became a judgment on May 11, 2015.  That recommendation stated the following regarding movable property:

> IT IS FURTHER ORDERED ADJUDGED AND DECREED that SUSANA is to contact ROSS to make arrangements to take possession of any of her personal/movable property that is left in the

29

home.  If she fails to do so by July 1, 2015, the[n] ROSS may dispose of said items as he sees fit.

At trial, Susana admitted that she did not make any attempt to contact Ross regarding her belongings.  Ross also testified regarding the storage unit.  He testified that a storage unit was necessary because when he "moved back into the former family home there were boxes stacked to the ceiling in the girls' room. . . .  So, for their safety I removed all those boxes from the home and put them in storage[.]"  He explained that there was not room to keep the boxes in the garage, and he felt that an air-conditioned storage unit was better to preserve the value of the items.  He further testified that after the custody hearing, he did not have a current email address, current phone number, or current address for Susana, and that the curator failed in his attempts to contact her.  Ross introduced the storage statement to corroborate his testimony that he began renting the storage unit on March 15, 2014, until August 2015, approximately one- and one-half months after he was required to keep Susana's possessions.

Under the May 11, 2015 judgment, it was Susana's obligation to arrange the pick-up of her movable possessions from Ross, which she failed to do.  Under that same judgment, Ross was obligated to keep Susana's possessions until July 1, 2015, when he could dispose of them.  Ross also provided reasonable reasons why a storage unit was necessary and provided the statement of expenses paid.  Based on the foregoing, we find no error in the trial court's determination that Ross proved he is owed a reimbursement claim for these storage fees.

**Assignment of Error No. 13:**

Susana asserts that the trial court erred in denying her reimbursement requests during the trial in 2018, when she did not have access to the community funds or

assets. Specifically, she seeks reimbursement for "legal fees in connection with attorney fees for divorce" and payments she made for "other community expenses[.]" She supports her claim by citing to her father's testimony that he loaned her money to "pay community expenses" and references the list of loans in the record.

Louisiana Civil Code Article 2365 provides that a spouse is entitled to reimbursement for one-half of the amount when his or her separate property is used to satisfy a community obligation. It was Susana's burden to prove that she expended separate funds on community obligations to entitle her to reimbursement. *Harriss*, 204 So.3d 209. However, we also recognize that La.Civ.Code art. 2362.1(A) provides: "An obligation incurred before the date of a judgment of divorce for attorney fees and costs in an action for divorce and in incidental actions is deemed to be a community obligation."

Susana's father, Jesus Fernandez, testified at the child support trial regarding loans he made to Susana. He testified that he prepared a document with dates and amounts that he transferred to Susana in the years 2015 through 2018, totaling $28,886.54. He also reviewed his bank statements while testifying, to explain some of the transfers, some of which were in Spanish. He testified that, while some of the amounts were transferred to Susana's account, some were paid directly to her apartment complex. Specifically, he paid the apartment complex directly while Susana was in the hospital for mental issues in 2017 to ensure she would have a place to go when she was discharged. He further explained that he loans Susana money because she does not have sufficient funds to pay her bills and expenses. He has also loaned her money for hotels when she needs to travel to see her attorney or appear for court as well as the money to hire an attorney in 2011.

31

Specifically, Mr. Fernandez reviewed his bank statement and testified that a transfer on December 20, 2011, for $5,000.00 was for Susana to retain an attorney. While Ross's counsel objected to the testimony as it did not relate to child support, we find it corroborates Susana's testimony that she hired an attorney in 2011 prior to any judgment of divorce. Thus, we find that the $5,000.00 for attorney fees in 2011 was a community obligation pursuant to La.Civ.Code art. 2362.1 for which Susana is entitled to reimbursement for one-half, or $2,500.00.

The spreadsheet entered into the record evidencing these loans show loans from 2015 through 2018. Some are labeled as loans for hotels, others are simply transfers. On October 4, 2015, there is a loan labeled "to pay for attorney retainer fees[,]" but it does not indicate which attorney or which part of this case the attorney was hired for: child support, child custody, or community partition.

Regarding the other assertions by Susana, Susana has not carried her burden in proving that she expended separate money, particularly the remainder of the money loaned to her by her father, on community expenses. Instead, the testimony was that the money loaned to her by her father, aside from the attorney fee in 2011, was for Susana's separate living expenses post-divorce and post-custody judgment. Thus, we find no error in the trial court's denial of these reimbursement claims, except for one-half of the $5,000.00 for 2011 attorney expenses.

**Assignment of Error No. 14:**

In her final assignment of error, Susana asserts that the trial court erred in denying her a "fair and equitable partition by denying her motions and ignoring her allegations of abuse and financial struggles." She further asserts that many of her motions denied by the trial court would have assisted the court in an equitable partition but were denied due to her failure to pay costs. Susana also references the

32

child support arrears she continues to pay and continues to suggest that the trial court erred in that ruling and failed to consider her financial and mental situation.

In its written reasons, the trial court acknowledged the numerous "courtesies" and continuances extended to Susana throughout these proceedings. The trial court stated:

> Mrs. Moody blames someone, other than herself, for whatever situation she finds herself in. This time, when questioned why she does not have documents in support of some of her claims or why she has not filed motions to compel or subpoenas to get documents, it is her attorney's fault, Mr. Moody's fault or Mr. Moody's attorney's fault because she does not have money or the documents. This Court has extended many courtesies to Mrs. Moody that it would not otherwise do in order to try and accommodate her mental health conditions. The court has given her numerous continuances and every opportunity possible for a fair and equitable trial . . . . However, the Court must apply the law based on the proof and evidence submitted at trial. If that evidence is not provided to the Court, the Court has to decide accordingly.

We also recognize that many of the continuances were requested by Susana herself. Furthermore, a review of the record does not indicate that "all motions . . . that would have assisted the court in determining a fair and equitable partition were ignored" due to her failure to pay costs. In fact, this court notes the following pleadings as indicating costs were not paid: a motion to continue the December 3, 2015 hearing, which may not have been related to the community partition at all as previously discussed; an April 6, 2016 objection to hearing officer's recommendations regarding child support, income tax deductions, and medical expense reimbursements; and a September 6, 2017 witness and exhibit list, pretrial memorandum.

As previously discussed, the record supports the conclusion that the trial court considered testimony and evidence presented by Susana, which challenged many of

33

the claims made by Ross. Susana was also permitted to file an updated detailed descriptive list, which is in evidence.

Considering the entirety of the record, we find no merit to this assignment of error.

**ROSS MOODY'S ANSWER TO APPEAL**

Ross filed an Answer to Appeal to assert four of his own assignments of error as discussed below.

**Assignment of Error No. One:**

First, Ross asserts that the trial court erred in determining and allocating the mortgage balance owed on the marital home as of the date of the partition trial. Specifically, Ross argues that the court erroneously used its own estimation rather than the mortgage statement in evidence to determine the mortgage balance, which would then require adjusting/reducing the equalization payment using the correct mortgage balance which is in evidence.

After concluding that the most recent mortgage statement in the record was April 21, 2015, the trial court estimated that the mortgage balance as of the date of the partition trial, August 21, 2019, was $79,000.00. The court explained its reasoning in the estimation:

> The obligation as of April 14, 2015, is $115,737.00. However, that is four years ago and there is no doubt that the mortgage has decreased as Ross testified that he has being making the mortgage payments and never missed a payment. From his statements of his mortgage payments, he has paid $52,887.32 in mortgage payments between the date of the Hearing Officer conference [April 21, 2015] and date of trial. . . . Recognizing it is not a dollar for dollar credit as not all of the payment is going towards the principal estimating an interest rate of around 3.5%, the difference between the total payments and the debt reduction in interest would be about $15,000 to $16,000 between 2015 and 2019, so the debt balance would be around $78,000 to $79,000.

34

However, Ross argues in brief that he introduced a mortgage statement dated July 2018, which indicated that the principal mortgage balance was $105,511.46 after his payment on July 1, 2018, a difference of $26,511.46 with the court's estimation. Thus, he argues, he "is entitled to a credit of ½ of that amount, or $13,255.73 toward (reduction of) the equalization payment."

Ross also acknowledges that payments were made between his July 1, 2018 payment and the date of trial, and that it would be reasonable to account for those payments as follows:

> A fair method would be to subtract the average mortgage principal payments Ross made between April 11, 2015 and August 1, 2018 ($115,737.00 less $105,511.46 - $10,225.54 / 39 [the number of mortgage payments between May 1, 2015 and August 1, 2018] = $262.19 x number of months between August 1, 2018 and August 20, 2019 [12] - $3,146.28) from the mortgage balance on August 1, 2019 . . . effectively making the mortgage balance as of August 20, 2019 $102,365.18 . . . In other words, Ross's equalization payment should be reduced by one half of this amount $11,682.59[.]

The statement referred to by Ross is found as Ross Moody 8, admitted at the trial on July 5, 2018. The statement shows Ross's principal balance after July 1, 2018, as $105,511.46, and that the interest rate was 5.75 percent, significantly higher than the trial court's estimate of 3.5 percent.

Although a trial court's factual determinations in valuing and allocating assets and liabilities are reviewed under the manifest error standard of review, when the record establishes that a reasonable factual basis does not exist for the finding, and the finding is clearly wrong based on the record, the appellate court may set aside those factual findings. *See Thomasee*, 362 So.3d 797 and *Arterburn*, 176 So.3d 1163. Thus, because we find the trial court committed manifest error in its calculation and failing to use the more recent mortgage statement showing an updated principal balance owed, we will conduct a de novo review and render a

judgment based on the merits. *Siverd v. Permanent Gen. Ins. Co.*, 05-973 (La. 2/22/06), 922 So.2d 497.

The record does not contain all mortgage payments made on the marital home. The trial court noted a balance as of April 14, 2015, but there was also a more recent balance as of August 1, 2018, in the record. The 2018 statement also shows the principal balance history dating back until July 5, 2017, at which time the principal balance was $108.863.16. Ross testified that the mortgage amount goes up or down, every May, depending on escrow.

Considering the lack of evidence regarding the principal mortgage balance between April 14, 2015, and August 1, 2018, we find the calculation presented by Ross, by averaging mortgage principal payments between those dates and dividing them by the number of months, thirty-nine, to be a fair way to estimate the principal balance as of the date of trial. In doing so, we reach a balance paid towards the principal of $3,146.28.

After subtracting $3,146.28 from the last known principal balance of $105,511.46, we conclude that a fair estimation of the principal balance on the date of trial, August 20, 2019, is $102,365.18. Thus, the community obligation on the home is $102,365.18. This alteration increases Ross's total liabilities from $79,000.00 to $102,365.18.

**Assignment of Error No. Two:**

In his second assignment of error, Ross asserts that the trial court erred in determining and allocating the fees of Dr. John Simoneaux. Due to this alleged erroneous allocation, Ross argues that his equalization payment should be reduced accordingly.

Ross asserts the trial court only taxed Susana with the payment of the initial visit to Dr. Simoneaux, $3,500.00, and failed to recognize two additional fees for the second custody evaluation and Dr. Simoneaux's testimony. Ross asserts that Susana lists these costs in her detailed descriptive list and only challenges her liability for the charges.

Regarding Dr. Simoneaux's fees, the trial court stated in its written reasons:

Ross seeks reimbursement for fees paid to Dr. Simoneaux for the parties' first and second custody evaluations totaling $8,500.00, and $3,000.00 for Dr. Simoneaux's testimony at trial. Per the Mental Health Order issued on April 26, 2011, Ross was ordered to pay the costs in advance and the Court was to reassess at trial. In the Court's judgment of March 12, 2014, the Court assessed all costs of the custody trial against Susana. The judgment of May 11, 2015, did establish the value of $3,500.00 for the first custody evaluation. However, no other values were established and no evidence introduced that any other fees were paid to Dr. Simoneaux by Ross such as cancelled checks, receipts or paid invoices. Accordingly, the Court will grant Ross reimbursement of $3,500.00 paid to Dr. Simoneaux.

The trial transcript of the discussion between the court and the parties indicates Ross asserted three charges for Dr. Simoneaux related to the child custody trial: $3,500.00, $5,000.00, and $3,000.00, which were the costs for two evaluations and fees for testimony.

After reviewing the voluminous record on appeal, this court cannot find any evidence of expenses for Dr. Simoneaux in the amounts of $5,000.00 and $3,000.00. While his two reports appear in our records, any associated invoices do not. The only mention of these numbers is the discussion between the court and parties at the August 21, 2019 trial. Furthermore, Ross does not provide any record citations for where those invoices or checks may be located. While Susana does list those values in her detailed descriptive list as "Ross' value," Susana does not give any value to these items. Furthermore, Susana testified generally that she included items on her

list because Ross had listed them on his, and she did so to challenge her potential liability for those claims.

Considering the lack of evidence regarding Dr. Simoneaux's charges, aside from the value set in the May 11, 2015 judgment, we find no error in the trial court's finding.

**Assignment of Error No. Three:**

Similarly, in his third assignment of error, Ross asserts the trial court erred in its determination and allocation of Dr. Patricia Post's fees for her testimony at the child support trial in September 2017. He further asserts that this amount should have been credited to him in the partition proceeding and that he is entitled to a reduction in the equalization payment.

More specifically, Ross explains that Dr. Post's testimony and report fees totaled $6,391.85, but the trial court only awarded a reimbursement of $2,000.00 finding that Dr. Post did not testify at any trials in 2017 or 2018. However, a review of the written reasons shows that the $6,391.85 was dealt with under the section of "Dr. Post Expenses," which had to do with Dr. Post's counseling of the children. The trial court indicates that Ross, in part, sought reimbursement of $6,391.85 for services between 2013 and March 14, 2014. The trial court did not grant reimbursement of this amount but did grant reimbursement based on the parties' percentages for uncovered medical expenses for all services from the custody trial date, March 14, 2014, through 2018.

Under the heading "Dr. Pat Post—Trial Testimony & Report," which is what Ross complains of in his brief, the trial court notes the following values that Ross seeks reimbursement for: $2,000.00 for testimony at child custody trial, $2,000.00 for child support trial, and $862.50 for Dr. Post's report for the court. The trial court

38

also references the receipts Ross introduced in support at trial. Specifically, the court explains:

> The receipts he introduced at trial in support of his claim were a receipt for $2,000 dated March 5, 2014, a receipt for $2,000 dated June 8, 2017, a receipt for $600 dated June 29, 2018, and an invoice date indicating a charge dated February 17, 2019, for legal work that he paid totaling $262.50.
>
> There is no doubt in the Court's mind that the payment of $2,000 on March 5, 2014, was for Dr. Post's testimony at the custody trial on March 12, 2014. Costs were assessed against Susana in the child custody trial (judgment of March 12, 2014). Accordingly, the Court will grant Ross reimbursement of this amount. The Court is not aware of any trials in 2017 or 2018 at which Dr. Post would be testifying. The child support trial did not occur until 2019.
>
> The Court is not aware of any letter requested by the Court in anticipation of a trial. Accordingly, without any invoices or other evidence that these receipts relate to any litigation in which the Court assessed costs to Susana, the Court denies Ross' request for reimbursement.

Ross's testimony and receipts in the record support the trial court's assessment that Ross sought litigation fees totaling $4,862.50, not $$6,391.85 as alleged in his brief. Of that $4,862.50, $2,000.00 was granted as reimbursement. Thus, we will review Ross's claims for the remaining $2,862.50, which pertains to testimony in 2017 and a report for the court.

Susana's counsel objected to the introduction of the receipts at trial, arguing that there is no corresponding invoice or indication what the receipts are for:

> MS. GARRETT [Susana's counsel]:
>     They don't have the medicals attached to them. They're receipts, but it doesn't say what they're for. It's just receipts.
>
> THE COURT:
>     Oh, well, then how would he know that they're related - -
>
> MR. HUDSON [Ross's counsel]:
>     Well, he would know that's what he paid for them, for instance, a $2,000 fee for a court appearance.

THE COURT:

Oh, it says court appearance?

MR. HUDSON:

No, but I'm saying he can testify that's what it was for. It's directly before the court, and the amount is a flat fee of $2,000 which is her court appearance fee.

MS. GARRETT:

They were paid by charge account receipts that he could easily have obtained.

THE COURT:

Yeah, you probably should have gotten a list from her. All right.

MR. HUDSON:

If not, Your Honor, at the least they would be cast as medicals which would then at least be subject to - -

MS. GARRETT:

Again, you have to have the documentation to support it.

THE COURT:

Well, I know they're medical. I mean, she doesn't do anything else.

MS. GARRETT:

But the EOBs, there's no EOBs attached to it to see what percentage the insurance paid, if any, and that's what the problem is with the other documents. They're incomplete.

THE COURT:

Okay. Well, they'll be received, and I'll just have to give them the weight that they get.

The receipts themselves are customer copies of paper receipts from The Psychology Clinic, with no information other than the date paid, the amount, and the credit card used to pay them. There are three: March 5, 2014, in the amount of $2,000.00; June 8, 2017, in the amount of $2,000.00; and June 29, 2018, in the amount of $600.00. Additionally, there is a Statement from The Psychology Clinic with several transactions, one being for legal work on February 17, 2019, in the amount of $262.50. This is the only receipt that provides a description of the charge.

We will first address the $600.00 and the $262.50. One trial date was held in 2018, that was on July 5, 2018, at which Dr. Post did not testify. There is no indication that a report or any work of Dr. Post was introduced at this date. Based on the receipt in evidence, there is no description of services for what the $600.00 paid. Thus, we find no error in the trial court's denial of this reimbursement claim. As for the $262.50 for February 17, 2019 legal fees, after reviewing the record this court finds no additional work provided by Dr. Post in 2019 or thereafter. Ross also does not provide any record citation to explain what this work was regarding.

Regarding the second trial testimony fee of $2,000.00, we find that the trial court did err in concluding that Dr. Post did not testify again in 2017. The record reflects that Dr. Post did testify on September 11, 2017, and two reports that she had previously prepared on February 18, 2016, and June 11, 2017, were admitted into evidence at that time. Dr. Post's testimony explains that those reports were summaries of treatment and were issued in preparation for court appearances.

In *Hodnett v. Hodnett*, 36,532, pp. 8-9 (La.App. 2 Cir. 9/18/02), 827 So.2d 1205, 1210, the second circuit stated the following pertaining to casting a party with costs:

> The party cast in judgment is generally taxed with costs, but the court may assess costs of a suit in any equitable manner. La. C.C.P. art.1920. Upon review, a trial court's assessment of costs can be reversed only upon a showing of an abuse of discretion. *Grocery Supply Company v. Winterton Food Stores*, 31,114 (La.App.2d Cir.12/9/98), 722 So.2d 94; *Rauch v. Rauch*, 98–730 (La.App. 5th Cir.12/16/98), 725 So.2d 558; *Mills v. Wilkerson*, 34,694 (La.App.2d Cir.3/26/01), 785 So.2d 69. The prevailing party is not taxed with costs unless in some way he incurred additional costs pointlessly or engaged in other conduct which justified an assessment of costs against that litigant. *Brown v. General Motors Corporation*, 95–245 (La.App. 5th Cir.10/18/95), 662 So.2d 531, *writ denied*, 95–3034 (La.2/16/96), 667 So.2d 1055; *Rauch v. Rauch, supra*.

In reviewing the prior judgments, we note, as did the trial court, that Susana was assessed with costs in the 2014 custody judgment. The child support judgment dated April 11, 2019, and the supplemental judgment dated April 30, 2019, did not assign a party with court costs. The September 11, 2017 trial date was part of child support hearings leading towards those 2019 judgments. While a portion of that September 11, 2017 hearing involved testimony on the partition issue prior to bifurcation, there is no question that Dr. Post's testimony was related to, and necessary, in calculating child support, as she testified to the children's need for a special caregiver.

Thus, considering the above, we do find it was error for the trial court to deny Dr. Post's fees of $2,000.00 for testifying in 2017. Additionally, after review we find that those fees should have been assessed against Susana, who was ultimately ordered to pay child support. Thus, the reimbursements owed by Susana to Ross should be increased by $2,000.00, awarding Ross $4,000.00 for reimbursement of "Dr. Post's Testimony" rather than the original $2,000.00.

**Assignment of Error No. Four:**

In his last assignment of error, Ross asserts the trial court erred in denying his claim for rental reimbursement during Susana's exclusive use and occupancy of the marital home. Ross argues that he reserved his right to a rental credit and his testimony that a fair rental value of the home was $2,000.00 per month was uncontroverted and should have been allowed.

On April 21, 2015, the Hearing Officer ordered an appraisal of the marital home to determine its value and fair rental value, however no testimony regarding the fair rental value from an appraiser was presented.

The mortgage statements show that Ross pays roughly $1,000.00 per month for the marital home. To determine a fair rental value, Ross went online to sites such as Zillow and Ingle Safari for comparable homes and considered their rental value. He testified that it was his "understanding . . . that about a dollar per square foot is the - - is a reasonable amount" and that the marital home is approximately 2,000 or 2,050 square feet. When his counsel offered documents to assist in Ross's memory, Susana's counsel objected to relevancy and validity, suggesting that Ross should have asked the appraiser who assessed the home's market value. The trial court agreed and sustained the objection.

Ross also argues that Susana listed the fair rental value of the home as $2,000.00 in her detailed descriptive list as well, and this should be considered a binding judicial confession. As Susana has before, we note that she testified she would agree to this number if it also applied to her reimbursement for the time Ross had exclusive use and occupancy of the home. In fact, she testified that, considering the mortgage payments, "a rental value of $2,000 seems excessive[.]"

The trial court determined that Ross only provided his own self-serving testimony regarding the rental value of the home. The court further noted that despite the Hearing Officer's order for an appraisal of the home to include a fair rental value, this was not done. Thus, the trial court held that "[w]ithout any evidence on which to determine a fair market rental value other than Ross's testimony, the Court will not grant this reimbursement request."

The factual findings and credibility determinations made by the trial court in valuing and allocating assets and liabilities are also reviewed for manifest error. *Thomasee*, 362 So.3d 797. We cannot say the trial court was manifestly erroneous

in not accepting Ross's self-serving testimony regarding the rental value of the home when no supporting evidence was submitted at trial.

Furthermore, we also find that Ross's rental reimbursement claim falls subject to the same error as Susana's claim. While Ross did make a claim for one-half of the reasonable rental value of the home in his March 2, 2011 Answer and Reconventional Demand, unlike Susana, the version of La.R.S. 9:374 (emphasis added) in effect at the time of trial required the trial court to determine at the time it awards the use and occupancy to a spouse, to also "**at that time** determine whether to award rental for the use and occupancy **and, if so, the amount of the rent**." The statute does provide that "[t]he parties may agree to defer the rental issue for decision in the partition proceedings. **If the parties agreed at the time of the award of use and occupancy** to defer the rental issue, the court may make an award of rental retroactive to the date of the award of use and occupancy." La.R.S. 9:374 (emphasis added).

A Stipulated Judgment was signed on March 1, 2011, which stated that the children would continue to reside in the marital home and be in the primary physical custody of Susana. Nothing in the Joint Stipulations was mentioned about a fair rental value of the home. Furthermore, the Stipulated Judgment signed May 17, 2011, also only states that Susana "shall have exclusive use and possession of the former marital home" without any discussion of a rental value or evidence that the parties agreed at this time to defer the issue. The next judgment or Hearing Officer Recommendation in which use and occupancy of the home is awarded is the March 12, 2014 judgment, wherein Ross was awarded use and occupancy of the home.

Considering the above, and particularly the discretion given to trial court's in making credibility determinations and factual findings, we find no merit to this assignment of error.

**CALCULATION OF EQUALIZATION PAYMENT:**

Based on the foregoing, three areas in the trial court's calculations of the parties' assets, liabilities, and reimbursements need to be amended. Thus, the final equalization payment requires recalculation.

In recalculating the payment, it came to this court's attention that the trial court's calculations of reimbursements owed by Susana and the "difference in reimbursements" were incorrect. However, these numbers will be amended and recalculated to reflect our changes to reimbursements for "Dr. Post's Testimony."

The alteration to the home mortgage increases Ross's total liabilities from $79,000.00 to $102,365.18. After subtracting Ross's liabilities from his total assets, the difference is now reduced to $582,365.30, and the difference in the parties' assets is $496,732.27. Therefore, the equalization payment owed by Ross prior to the consideration of any reimbursements is $248,366.14.

The alteration to the reimbursement owed by Susana to Ross for Dr. Post's Testimony (an increase from $2,000.00 to $4,000.00) results in total reimbursement owed by Susana to Ross of $218,658.26.

Additionally, Susana is entitled to a reimbursement of $2,500.00 from Ross for one-half of the payment of attorney fees in 2011, which were a community obligation. Ross owed Susana reimbursement in the amount of $6,439.23. Therefore, the new reimbursement owed to Susana is $8,939.23 ($6,439.23 + $2,500.00). The difference in reimbursements is now $209,719.03 ($218,658.26 - $8,939.23).

Considering these new totals, the final equalizing payment owed by Ross to Susana is $38,647.11 ($248,366.14 - $209,719.03).

**DECREE:**

Accordingly, the trial court's April 30, 2020 judgment partitioning the community property of Susana Moody and Ross Moody is affirmed in part and reversed in part. The final equalizing payment owed by Ross to Susana has been recalculated to reflect the decisions of this court. Ross Moody is ordered to pay Susana Moody an equalizing payment in the amount of $38,647.11. All costs of this appeal shall be assessed equally between Ross Moody and Susana Moody.

**MOTION TO STRIKE GRANTED. JUDGMENT AFFIRMED IN PART; REVERSED IN PART; AND RENDERED.**

This opinion is NOT DESIGNATED FOR PUBLICATION.
Uniform Rules—Courts of Appeal, Rule 2-16.3.